**Quincy Vernon JONES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–06–00003–CR.**

Court of Appeals of Texas, San Antonio.

Aug. 1, 2007.

152

From the 290th Judicial District Court, Bexar County, Texas, Trial Court No.

2005–CR–0602; Olin B. Strauss, Judge Presiding.[1]

Hilary Sheard, Senior Asst. Public Defender, San Antonio, for appellant.

Mary Beth Welsh, Asst. Crim. Dist. Atty., San Antonio, for appellee.

Sitting: CATHERINE STONE, Justice, KAREN ANGELINI, Justice, STEVEN C. HILBIG, Justice.

## MEMORANDUM OPINION

Opinion by STEVEN C. HILBIG, Justice.

Quincy Vernon Jones appeals his two convictions for aggravated robbery. Jones raises two points of error contending (1) the evidence was factually insufficient to support his conviction, and (2) the trial court abused its discretion in denying the motion for new trial based on newly discovered evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 31, 2004, a man with a type of mesh material covering his face entered a fast food restaurant in San Antonio, Texas. He grabbed one of the employees, Judith McClure, pointed a gun at her, and threatened to kill her if the other employees did not comply with his demands. While holding McClure, he ordered another employee, Shawn Turk, to empty the cash registers and place the cash in a small gray duffle bag provided by the gunman. Turk was unable to open the register for the drive-thru without the keys, so the gunman instructed him to get the keys from the assistant manager Roger Ruiz. Ruiz was in the back of the restaurant preparing to close the store. When Turk went to obtain the keys, Ruiz accompanied him to the front of the store where Ruiz saw the gunman. The gunman ordered Ruiz to open the safe. Ruiz attempted to comply, but explained to the gunman the safe was on a time-lock and could not be opened. Eventually, Ruiz convinced the gunman the safe could not be opened. During all of this, the gunman was holding McClure and pointing the gun either at her, Turk, or Ruiz.

After obtaining all the money[2] from the registers and realizing he would not be getting any money from the safe, the gunman asked who owned the Ford Mustang parked in the back of the restaurant. After learning it belonged to Turk, he demanded the keys, which Turk immediately handed over. The gunman then walked all three employees to the back while still holding McClure and displaying the gun. The gunman ordered them into one of the restaurant's "coolers."[3] McClure told the gunman she was afraid to enter the cooler so the robber put Ruiz and Turk inside and shut the door. The gunman took McClure to another part of the store and told her to count to sixty. After she heard the back door close, she released Ruiz and Turk from the cooler. When they emerged, the gunman and Turk's car were gone. Ruiz called the police.

Officer Jared Day of the San Antonio Police Department was dispatched to the restaurant. He obtained a composite description of the gunman from Ruiz, Turk, and McClure: black male, approximately 5'2", and 160 pounds. The witnesses collectively described the suspect's gun (silver or black handgun), the duffle bag (small

1. Senior judge sitting by assignment.

2. Ruiz testified $2,195.00 was taken in the robbery.

3. The restaurant had several walk-in refrigerators. The witnesses referred to them variously as a "cooler" or "freezer."

and gray), and his clothing (long-sleeved shirt over a black shirt, jeans, and gloves). They also advised that the suspect had worn a covering over his face that appeared to be made of some sort of black nylon or mesh material. The material was similar to pantyhose rather than a ski mask. The witnesses told the officer the gunman had taken Turk's vehicle. The car was a white Ford Mustang with very distinctive black running horses on the door panels and the rear window. After receiving all of this information, Officer Day broadcast a description of the suspect and the car.

Later that evening, Officer Ed Miller was dispatched to a convenience store for a reported theft. When he pulled into the parking lot he observed a Ford Mustang matching the description broadcast earlier by Officer Day. Officer Miller parked approximately twenty-five feet away from the Ford Mustang and began watching the vehicle. He noticed there was a single individual sitting in the driver's seat of the car and the engine was running. Officer Miller ran the vehicle's license plate and confirmed it was the vehicle taken in the earlier aggravated robbery. While Officer Miller was advising the police dispatcher of his location, the driver got out of the Ford Mustang and walked to a pay phone. Officer Miller approached the driver from behind, told him to put his hands behind his back, handcuffed him, and performed a cursory pat down for weapons. The driver offered no protestations to the officer's actions. Officer Miller found the driver's wallet that contained approximately $1,000.00. After other officers arrived at the scene, Officer Miller transported the driver, who was ultimately identified as Quincy Vernon Jones, to police headquarters.

Detective Investigator Jesse Garcia testified he processed the Ford Mustang for evidence. Garcia observed a towel with a "black scarf" on the passenger side of the vehicle. There was some money "sticking out" from under the scarf. Garcia opened the trunk and recovered a black pistol from the trunk. The weapon turned out to be a "BB gun" that operated by use of a carbon dioxide cartridge.[4] Garcia also found a large green duffel bag with clothing, medications, and other personal items in the trunk.

Meanwhile, the police notified Turk that his vehicle had been recovered. Turk arrived at the location while Garcia was processing the car. Turk told Garcia the money and scarf did not belong to him. Turk also confirmed none of the items from the trunk belonged to him. Turk identified the weapon as the one used in the robbery.

Several days after the robbery, each witness from the restaurant was individually contacted and asked to come to the police station to provide a statement. Each was questioned separately about the events of that night and asked to attempt to identify the gunman from a six-man color photo array. Neither Ruiz nor Turk identified a suspect from the photo array. McClure, however, immediately picked Jones's photo from the array and identified him as the man that had committed the robbery at the restaurant on October 31, 2004. She also identified him during trial.

Jones was indicted on two counts of aggravated robbery with a deadly weapon.[5] A jury convicted Jones on both charges and the trial court sentenced him to confinement in the Texas Department of

---

**4.** Jones does not challenge the jury's implicit finding that the BB gun was a deadly weapon.

**5.** Turk and McClure were named as victims in Count One and Count Two respectively.

Criminal Justice–Institutional Division for twenty years on each charge, the sentences to run concurrently. Jones now appeals.

## ISSUES ON APPEAL

### Factual Sufficiency

#### Standard of Review

When reviewing a factual sufficiency challenge, "we review all of the evidence in a neutral light, and we will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met." *Garza v. State*, 213 S.W.3d 338, 344 (Tex.Crim.App.2007). A factual sufficiency review must be appropriately deferential to avoid the reviewing court substituting its judgment for that of the trier of fact. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex.Crim.App.1997). Our evaluation should not substantially intrude upon the trier of fact's role as the sole judge of the credibility of the witnesses' testimony. *Id.*

#### Jones's Contentions and Testimony

Jones contends the evidence was factually insufficient to establish he was the person who committed the aggravated robberies on October 31, 2004. He argues the State's evidence was weak and is overcome by his evidence that established he was physically incapable of having committed the crimes. To support his claim, Jones points to inaccuracies and discrepancies in the eye witnesses' accounts regarding the gunman's height,[6] clothing, and descriptions of the gun. Jones also contends the witnesses' descriptions conflict with his actual physical characteristics and

the clothing he was wearing at the time of his arrest some two and one-half to three hours after the crimes were committed. As to defensive evidence of his inability to commit the crime, Jones argues his extreme eczema, which he alleged covered almost his entire body including the bottoms of his feet, made it almost impossible for him to walk. Accordingly, Jones argues he would have been physically incapable of engaging in the physical movements similar to the gunman's and/or the witnesses would have noticed his physical condition if he were the actual gunman. Moreover, none of the witnesses to the robbery even mentioned seeing any skin problems on the robber.

Jones testified in his own behalf and denied committing the crimes. He told the jury he was getting a ride to the bus station to visit his grandmother in California. Jones's cousin Damien Johnson could not take him as previously promised and made arrangements for "Mike" to drive Jones instead. Mike was driving the Mustang when he "picked up" Jones. Jones testified he knew Mike's girlfriend had a white Mustang. When they pulled into a convenience store, Jones asked Mike to go in and buy him some cigarettes. While Mike was inside, Jones exited the car from the passenger side and walked to the pay phone. Mike came out of the store and handed Jones the cigarettes, met an "elderly white gentleman," and went back inside the store. Mike was in the store when Officer Miller approached Jones and he fled on foot when he saw Jones with the police. Jones could not provide Mike's last name and neither Mike nor Johnson appeared in court to corroborate Jones's assertions. Jones testified the money found at the time of his arrest, approximately

---

6. As noted above, Officer Day broadcast a description that the robber was 5′ 2″. Jones testified he was 5′ 7″ to 5′ 8″ in height.

one thousand dollars, was generated by his previous work and gifts from a baby shower.

Jones also testified he could not have been the robber because of his severe eczema. Jones, who was not wearing shoes at the time of his arrest, claimed he could only walk on his "tippy toes" and could not wear shoes.[7] He testified he was covered from head-to-toe with eczema and the bottom of his feet were so badly affected they had no skin layer and were covered in lacerations. He stated he had been hospitalized for this condition for two weeks in October, just two weeks before the robbery. Jones testified that after his arrest he was taken to the hospital because police noticed his bloody socks at the magistrate's office. Officer Miller testified he noticed Jones had sores on his wrists when he arrested him and questioned Jones about the condition of his skin.[8] A photograph of Jones taken after his arrest was admitted into evidence and demonstrated to the jury. Jones testified the photograph did not clearly show his skin condition but said it showed some "peeling" skin.

Jones also offered the jury an alibi to explain why he could not have been the robber. He testified he was at the home of his fiancee's parents when the robbery occurred. He stated that he was in the home with his fiancee, her parents, and her brother.

### Analysis

While Jones is correct that the witnesses did not agree on all points in their respective testimony, there is sufficient evidence to support the verdicts. Although Jones testified about the severity of his skin condition, he offered no other evidence, through live testimony or documents, to support his claim. Ruiz and McClure testified the gunman was wearing a long-sleeved shirt. Ruiz said he was wearing gloves, though neither Turk nor McClure could recall this fact. The witnesses' failure to notice his skin condition, presuming it was as noticeable as Jones claims, can be explained by this testimony. Furthermore, the jury was free to judge the credibility of Jones's claims about the severity of his ezcema based on his testimony as well as a photograph taken shortly after his arrest.

The evidence is undisputed that when Jones was arrested he was not wearing any clothing matching the clothing described by any of the witnesses. However, Jones admitted he lived very close to the restaurant and could have changed his clothing before his arrest. Jones is taller than the height of the gunman originally reported by the witnesses. While this fact might raise some question about identity, Ruiz testified that even though the robber's face was covered, it would have been possible to identify the robber if one were close enough, as McClure had been. Although Ruiz and Turk were unable to pick Jones from a photo array, McClure identified Jones without hesitation from a six-person photo array and also identified him at trial. She testified that despite the face covering worn by the gunman, she could still see his features.

All of the witnesses said the robber took Turk's vehicle. Officer Miller testified he saw Jones in the driver's seat of what was later identified as Turk's vehicle. The officer did not observe anyone else in the car. According to the officer and contrary to

---

7. Shoes were found in the car when Jones was arrested.

8. Officer Miller gave conflicting answers when asked whether Jones was taken to the hospital after his arrest.

Jones's testimony, Jones was sitting in the driver's seat with the engine running and exited the vehicle from the driver's side. Officer Miller's testimony also contradicted Jones's testimony that he had exited the vehicle, walked to the pay phone, and obtained cigarettes from Mike while at the phone. Officer Miller indicated he arrested Jones nearly simultaneously with Jones's arrival at the phone. Jones's only response to Officer Miller's testimony was to suggest the officer was lying.

Detective Investigator Garcia testified the gun recovered from Turk's car was black. A firearm expert testified the gun recovered during Jones's arrest was, from his memory,[9] partly black. McClure testified the robber's gun was black. While Ruiz and Turk testified at trial that the gun was silver, Turk identified the gun recovered at the scene of Jones's arrest as the one used in the robbery that same morning.

As for Jones's alibi, Jones asserted he had been "involved" with his fiancee since August 2004. Yet on cross-examination, Jones could not provide the last name of his fiancee nor could he provide either the first or last names of his soon-to-be in-laws. Neither the fiancee, her parents, nor her brother appeared at trial in support of Jones's alibi.

We find the evidence was factually sufficient to support Jones's convictions on both counts of aggravated robbery with a deadly weapon. The State's evidence was not so weak that the verdict was clearly wrong and "manifestly unjust," nor was Jones's evidence so strong that the standard of proof beyond a reasonable doubt was not met. *See Garza,* 213 S.W.3d at 344. Accordingly, we overrule Jones's first point of error.

9. The gun and other evidence relating to the

### *Newly Discovered Evidence*

#### *Standard of Review*

 A motion for new trial must be granted where material evidence favorable to the accused has been discovered since trial. Tex.Code Crim. Proc. Ann. art. 40.001 (Vernon 2005); *see Keeter v. State,* 74 S.W.3d 31, 37 (Tex.Crim.App.2002). The trial court has discretion to grant a motion for new trial based upon newly discovered evidence and its ruling will not be reversed unless the trial court abused its discretion. *Keeter,* 74 S.W.3d at 37; *Shafer v. State,* 82 S.W.3d 553, 556 (Tex. App.-San Antonio 2002, pet. ref'd). To establish an abuse of discretion for failure to grant a motion for new trial based on newly discovered evidence, the appellant must show: (1) the evidence was unknown or unavailable to him before trial; (2) his failure to discover the evidence was not due to a lack of diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and its materiality will probably result in a different outcome following a new trial. *Keeter,* 74 S.W.3d at 36–37; *Shafer,* 82 S.W.3d at 556. If the appellant fails to establish any one of these elements, the trial court does not abuse its discretion by denying the motion for new trial. *Shafer,* 82 S.W.3d at 556.

#### *Jones's Contentions*

 Jones argues the trial court abused its discretion in denying his motion for new trial on the basis of newly discovered evidence. The "new" evidence Jones refers to are his own medical records from the night of his arrest. Jones argues that if he had been able to present his medical records to the jurors they would have be-

crime were apparently destroyed before trial.

lieved he was physically incapable of committing the offenses.

*Analysis*

Jones fails the first prong of the test set forth in *Keeter.* Jones's medical records were obviously known to him before trial. He was arrested on October 31, 2004, and by his own testimony was taken to the hospital that same day. The trial did not begin until October 2005. Jones asserts his records were "unavailable" to him because his counsel failed to acquire them after obtaining a medical release from Jones and/or the State was required to turn then over to him under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

██ Jones's argument is without merit. His medical records were available, Jones simply failed to procure them.[10] The alleged *Brady* violation is baseless because *Brady* does not apply to evidence known to the defense. *Hayes v. State,* 85 S.W.3d 809, 814–15 (Tex.Crim.App.2002). Furthermore, Jones failed to request a continuance or present his *Brady* claim in his motion for new trial. Both actions are required to preserve a *Brady* claim for appellate review. *See Keeter v. State,* 175 S.W.3d 756, 759–61 (Tex.Crim.App.2005) (holding failure to raise alleged *Brady* error as a separate complaint during hearing on motion for new trial waives error), *cert. denied,* 546 U.S. 852, 126 S.Ct. 114, 163 L.Ed.2d 124 (2005); *Williams v. State,* 995 S.W.2d 754, 761–62 (Tex.App.-San Antonio 1999, no pet.) (holding failure to request continuance based on alleged *Brady* violation waives error).

We hold Jones's medical records were available to Jones before the trial and there was no *Brady* violation. Accordingly, the trial court did not abuse its discre-

tion in denying the motion for new trial and we overrule point of error two.

## CONCLUSION

Based upon the foregoing, we affirm the trial court's judgment.

---

**10.** Jones does not argue his counsel rendered ineffective assistance.