**Vacate and Reinstate and Opinion Filed February 4, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

---

### No. 05-12-00154-CR

---

**THE STATE OF TEXAS, Appellant**
**V.**
**TERRANCE GERMAINE WILKINS, Appellee**

---

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause No. F10-62224-X**

---

## OPINION

Before Justices Bridges, FitzGerald, and Myers
Opinion by Justice FitzGerald

A jury convicted appellee of capital murder. The court imposed an automatic sentence of life imprisonment without the possibility of parole. The trial court granted appellee's motion for new trial based on newly discovered evidence. The State of Texas appeals; appellee asserts seven cross-points of error.

**Issue**

The issue presented is whether the trial court erred in granting appellee's post-judgment motion for new trial based on newly discovered evidence.

**Factual Background**

On October 26, 2010, Officer Timothy Gilliam responded to a burglary call. He knocked on the door of the apartment in question, and the door was opened by Sarah Malesky. Malesky was frantic, crying, and appeared to be in a state of shock.

Malesky led the officer to a bedroom. The door was partially open, but there was an object in front of the door that prevented it from being opened completely. When the paramedics pushed the object away, the officer saw the decedent, Carlon Hellner, lying on the floor between the bed and a chair. Hellner appeared to have been shot. The paramedics subsequently told the officer they were unable to resuscitate Hellner and believed he was dead.

Detective Will Vick was dispatched to the apartment, where he met with Malesky and the patrol officers. Vick observed that there was no forced entry into the apartment. As he did an initial walk-through of the apartment, Vick noticed that the freezer door was open, a closet door was off of its hinges, and a chair was knocked over. A glass table near Hellner's bed had been knocked askew, and held a crack pipe and drug baggie. There was a knife on the nightstand by the bed in Malesky's bedroom, and three baggies of marijuana, an aluminum container, a digital scale, and a grinder were found in her closet. No weapons were found. Detective Vick also found two empty prescription bottles of hydrocodone and an empty prescription bottle for Alprazolam. There were no blood spatters or latent fingerprints.

Jill Urban, a forensic pathologist, testified about the autopsy that was performed on Hellner. There were two gunshot wounds to the right shoulder, with no exit wounds. The gunshot wounds resulted from a contact or close range shot, and it was difficult to determine if there had been a struggle. The toxicology report showed no cocaine present but Hellner's blood contained cocaine metabolites. Urban explained that the presence of cocaine metabolites indicates it is likely Hellner smoked or ingested cocaine several hours before he died.

Although Hellner had a degree of heart function when he was transported by the paramedics, Urban opined that he could not have survived longer than thirty minutes after sustaining the gunshot wounds. Hellner also had a normal body temperature, which, according to Urban, indicated that Hellner's wounds were sustained within minutes of his receiving EMS treatment. Urban further testified that a "head hair standard" and fingernail clippings were taken from Hellner. The fingernail clippings were not examined.

A trace evidence examiner testified that she examined Hellner's clothing and found two holes in the right front shoulder of his t-shirt. The examiner testified that there was a nitrate reaction, lead wipe, and vaporous lead reaction near the sites, indicating that the shots were within an eighteen to twenty-four inch range. A trace evidence supervisor testified that he examined the gunshot residue test performed on Hellner. The test showed gunshot residue particles on the back of Hellner's right hand.

Malesky testified Hellner resided with her in the apartment where he was found. She had known Hellner for five years and lived with him for four months before he was killed. Malesky described her relationship with Hellner as a "father daughter" type relationship. Malesky and Hellner sold drugs out of the apartment, and he would drive for her, take phone calls for her, and protect her. She sold one or two pounds of marijuana a month.

The apartment next door was a "trap house" where crack and cocaine were sold. Appellee, whom Malesky had known for about a month, sold cocaine out of this apartment and sold some cocaine to Hellner before his death. When the trap house opened, Hellner relapsed and began using crack again. A man named "Nate" ran the trap house. At one point in her testimony, Malesky recalled telling the police that Nate called her on the day of the incident.

Malesky said appellee had been in the apartment with her once. Malesky did not know if appellee spent a lot of time in the apartment with Hellner when she was not there. She said

Hellner would give appellee rides to another apartment complex, and appellee would pay him with a nickel rock of crack. Malesky had also given appellee a ride in her car at least once. According to Malesky, Hellner would get upset because appellee showed up and knocked on their door a lot.

Malesky testified that on the night Hellner was killed, she was ill with a fever, sore throat, and coughing. She and Hellner kept the front door locked and it was locked on this occasion. She took twice the recommended dose of Theraflu, smoked marijuana, and took Xanax. At around 6:00 p.m., she went to sleep with the lights on in her bedroom. She awakened to find appellee standing over her pointing a gun at her. He did not wear a mask or try to hide his identity. Before he woke her up, she heard the dogs barking. Appellee demanded money and marijuana and picked up some change she had on her table. Appellee asked Malesky where her stash was, and led her out into the living room. Malesky told appellee there might be some marijuana in the freezer. When he walked to the refrigerator, she tried to run, but appellee caught her by the arm and told her to stop playing. He forced her into the bathroom, and as he was closing her door said, "Sorry about [your] daddy, but he started tripping."

When she thought it was safe, Malesky picked up her knife and went to check on Hellner. She could not get into Hellner's room because the closet door was falling over and barricading the door to the bedroom. She pushed the door open and saw Hellner lying on the floor. She shook him by his left shoulder and touched his neck but felt no pulse. When she saw he wasn't breathing, Malesky pulled a cell phone out of Hellner's pants pocket and called 911. After she called 911, she took the marijuana that was hidden under Hellner's mattress and put it in her bedroom. Malesky said she did not see Hellner get shot.

Malesky admitted that when she talked with detectives, she tried to cover up the drug activity and did not tell them she was selling and using drugs. Although she initially told the

–4–

police that cash and other items were taken from her apartment, she subsequently found everything she had reported missing. In her interview with the police, Malesky said she knew nothing about the marijuana and it was something that only Hellner had. When she testified, however, she stated that she bought the pound of marijuana for $450 a week before the incident. Malesky recalled telling the detective that Hellner had to have let appellee into the apartment and maybe they had been fighting about money or dope. She thought there had been a struggle in the bedroom.

Malesky was tested for gunshot residue at the police station. A trace evidence examiner testified that she examined Malesky's gunshot residue kit and found two primer gunshot residue particles on the back of Malesky's right hand. The examiner was unable to offer an opinion as to where the particles came from and how they were transferred.

Appellee was aware that the police were looking for him, but he was not apprehended until twenty days after the incident. When appellee was arrested and brought to Detective Quirk's office, he said Hellner had called him and he was in the apartment that night to deliver drugs to Hellner. He admitted to waking up Malesky with a gun in his hand and looking for drugs in the freezer. Appellee said that he did not remain in the apartment because he had drugs on him and wanted to get rid of them that night. Appellee described his gun as a .38 and said he later sold the gun in South Dallas. Appellee repeatedly denied shooting Hellner. Instead, he claimed to have found Hellner on the floor in his bedroom when he arrived at the apartment.

Quirk testified there was no DNA, gunshot residue, fingerprint, or other physical evidence linking appellee to the offense.

Heather Thomas, a firearm and tool mark examiner for the Dallas County Crime lab testified about the bullets that were fired and examined as evidence. Thomas stated that there were two bullets, fired by the same gun, consistent with a .32 caliber revolver.

The day after the medical examiner testified about the autopsy and the fact that fingernail clippings had been taken from Hellner, there was discussion among counsel and the court about several evidentiary matters including the fact that the fingernail clippings had not been tested and how to proceed. After discussing the pros and cons of being able to even test the clippings, the parties agreed that the trial should continue while the tests were being performed. The court and both sides agreed.[1] The court tried to expedite the testing process. After the state rested, both sides closed. The test results were reported to the court while the jury was deliberating its verdict. The tests showed that Hellner had biological material under the fingernails of his right hand that did not belong to appellee or Malesky.

**Motion for New Trial**

Appellee moved for a new trial based on newly discovered evidence. The motion recited that during the testimony of the medical examiner, "it was discovered that the victim's fingernail clippings taken from the victim were preserved for any future forensic analysis and that no DNA analysis had been performed on this biological material to determine if there was DNA present from any person not the complainant, witness Malesky or the defendant that would support the defense theory of the case that the victim was killed by some other third party, who was present at the scene, while Malesky was asleep in a drugged state of mind that prevented her from hearing the gunshots that killed the deceased." The motion stated that the DNA testing that was performed during trial confirmed that the right hand fingernail sample of the victim contained DNA from a third person who had not been identified, which could have been deposited under the fingernail in a struggle between the victim and "an assailant."

---

[1] Appellee initially testified that he did not want the clippings tested because he was concerned about further delay. But appellee later indicated he was in agreement with the plan to proceed with the trial while the testing was conducted and then pursue a motion for new trial if the results were favorable to his position.

At a hearing on the motion, defense counsel stated he had inadvertently not seen the reference in the autopsy report to the fingernail clippings and the testimony of the medical examiner had caught him by surprise. The DNA test report was received into evidence. The trial judge granted the motion for new trial. No findings of fact were requested or made.

**Standard of Review**

In a single issue, the State asserts the trial court erred in granting appellee's motion for new trial. The State is entitled to appeal in a criminal case as authorized by law. TEX. CONST. art. V, § 26. Article 44.01 of the Texas Code of Criminal Procedure permits the State to appeal a trial court's order in a criminal case under limited circumstances, including when the order grants a new trial.[2] *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a) (West Supp. 2012); *State v. Bounhiza*, 294 S.W.3d 780, 782 (Tex. App.—Austin 2009, no pet.). When the State appeals a trial court's order that grants a motion for new trial, an appellate court reviews the trial court's decision for an abuse of discretion. *See State v. Gonzalez,* 820 S.W.2d 9, 12 (Tex. App.—Dallas 1991), *aff'd*, 855 S.W.2d 692, 696 (Tex. Crim. App. 1993). An abuse of discretion occurs when the trial court's decision was arbitrary or unreasonable. *See State v. Read*, 965 S.W.2d 74, 77 (Tex. App.—Austin 1998, no pet.). While we must afford the trial court wide discretion when reviewing an order granting a motion for new trial, that discretion is not without limits. *See State v. Herndon*, 215 S.W.3d 901, 902 (Tex. Crim. App. 2007).

**Newly Discovered Evidence**

The motion for new trial at issue here is premised on a claim of newly discovered evidence. Motions on this ground are closely scrutinized. *Gray v. State*, 144 S.W. 283 (Tex.

---

[2] The circumstances in which the State may appeal from a trial court order in a criminal case include when the order: (1) dismisses an indictment, information, or complaint or any portion of an indictment, information, or complaint; (2) arrests or modifies a judgment; (3) grants a new trial; (4) sustains a claim of former jeopardy; (5) grants a motion to suppress evidence, a confession, or an admission, if jeopardy has not attached in the case and if the prosecuting attorney certifies to the trial court that the appeal is not taken for the purpose of delay and that the evidence, confession, or admission is of substantial importance in the case; or (6) is issued under Chapter 64. TEX. CODE CRIM. PROC. ANN. art. 44.01(a).

Crim. App. 1912). Motions for new trial based upon newly discovered evidence are controlled by Article 40.001. *Keeter v. State*, 74 S.W.3d 31 (Tex. Crim. App. 2002). Article 40.001 of the code of criminal procedure provides that "[a] new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." TEX. CODE CRIM. PROC. ANN. art. 40.001 (West 2006); *Wallace v. State*, 106 S.W.3d 103, 107 (Tex. Crim. App. 2003). A defendant is entitled to have his motion for new trial granted if: (1) the newly discovered evidence was unknown to the movant at the time of trial; (2) the movant's failure to discover the evidence was not due to his want of diligence; (3) the evidence would probably bring about a different result in another trial; and (4) the evidence is admissible and not merely cumulative, corroborative, collateral or impeaching. *Wallace,* 106 S.W.3d at 108; *Keeter*, 74 S.W.3d at 37.

**Relevant Background**

The record shows the state furnished the autopsy report to defense counsel about six months before trial. It contained the following notation midway down page three of the six-page report:

> Evidence Submitted:
>
> The following items are collected, sealed within appropriately-labeled containers, and submitted to the Criminal Investigation Laboratory:
>
> Two bullets
>
> *Two envelopes of fingernail clippings*
>
> Blood standard
>
> Hair standard
>
> Gunshot residue kit
>
> Clothing

Thereafter, the blood was tested as part of the autopsy. The bullets, the gunshot residue kit, and the clothing were sent to the lab and reports prepared. The fingernail clippings were sent to the laboratory but not tested.

On November 29, 2011, prior to the commencement of testimony at trial, the State made the following statement in open court: "At this point we are going to offer into evidence for record purposes only medical evidence as collected during the course of the investigation." The State referred to specific exhibits including exhibit 105, clothing collected from the complainant's body, exhibit 107, the gunshot residue test conducted on the complainant, and *exhibit 108, biological samples from the complainant*. The record shows State's Exhibit 108 was identified as "Decedent's samples from autopsy; hair, blood, *fingernails*." Exhibit 108 contained the actual fingernail clippings of the decedent referred to in the autopsy. These exhibits were admitted without objection, request or comment, before the court and later before the jury.

During the afternoon session on November 30, 2011, the medical examiner testified about the fingernail clippings in state's exhibit 108, as reported in the autopsy report. She stated that no testing had been done on the fingernail clippings. When the testimony concluded for the day, defense counsel did not make a request for DNA testing of the fingernail clippings.

The record shows the first discussion about DNA testing of the fingernail clippings occurred the following day, December 1, 2011. The fingernail clippings were taken out of exhibit 108 and withdrawn from evidence in order to permit an analysis to be conducted.

**Analysis**

We begin with the first prong of the *Keeter* test: whether the DNA test results were newly discovered evidence unknown to the appellee at the time of trial. It is undisputed that the State had furnished defense counsel the autopsy report months before trial, that the report clearly referred to the fingernail clippings taken from the decedent, and that defense counsel completely

–9–

overlooked the report's reference to the fingernail clippings. Counsel advised the court he was shocked when the medical examiner testified about the fingernail clippings.

Appellee characterizes the DNA test results conducted on the fingernail clippings as the newly discovered evidence and argues the test results were unknown to him at the time of trial. At trial, however, it is clear that counsel was alarmed only after realizing that the autopsy reported the collection of fingernail clippings, a fact counsel admitted overlooking, and that no DNA testing had been conducted. In other words, the evidence which was newly discovered by counsel was the fingernail clippings. Counsel's oversight, however, does not render the originally discovered evidence, the fingernail clippings, or the subsequently developed evidence, the DNA test results, "newly discovered evidence" simply because counsel belatedly realized the existence of the fingernail clippings and the potential significance of DNA testing. The autopsy report and the information regarding the fingernail clippings were in defense counsel's possession for months. Such possession imputes counsel with knowledge of the contents of the document. Otherwise, disclosure by the State could be easily undercut by counsel's failure to examine a document. Nor may appellee advance a claim of "newly discovered evidence' by arguing, as he does, that the DNA test results conducted on the fingernail clippings were unknown to him at the time of trial. The DNA test results were unknown to appellee but only because counsel failed to take advantage of the material disclosed and failed to request such testing prior to trial. What appellee ignores is that the DNA testing process was known and available at the time of trial. Appellee simply failed to utilize it. The appellee is responsible for his own lack of knowledge and the unavailability of the test results. Appellee had the opportunity to request DNA testing after receiving the autopsy report. He had a second opportunity when the State offered exhibit 108, the actual clippings, into evidence at the outset of the trial because exhibit 108 again placed him on notice of the fingernail clippings. But in

each instance, counsel took no action. We, therefore, find no merit in appellee's argument that the DNA test results should be characterized as newly discovered evidence unknown to appellee. *See Jones v. State*, 234 S.W.3d 151, 158 (Tex. App.—San Antonio 2007, no pet.) (rejecting newly discovered evidence argument because medical records in question "were available, [but] Jones simply failed to procure them").

The second prong of the *Keeter* test is whether appellee's failure to discover the evidence resulted from a lack of diligence.

The record reflects that an autopsy was performed, and a report prepared. The autopsy report indicates that a number of items were "collected, sealed within appropriately-labeled containers, and submitted to the Criminal Investigation Laboratory," including two envelopes of fingernail clippings. Defense counsel admitted he received the autopsy report and completely overlooked the reference to the fingernail clippings in the autopsy report. Diligence requires counsel either to inquire as to the status of the testing when an autopsy report clearly discloses evidence of fingernail clippings or to pursue independent DNA testing. Counsel's inaction does not meet the *Keeter* test and clearly demonstrates "lack of diligence."

The autopsy report in a capital murder trial is significant, and it is counsel's responsibility to review pertinent documents and investigate before the trial occurs. On a motion for new trial based on newly discovered evidence, the defendant has the burden to show that the failure to discover the evidence did not result from a lack of diligence. *See Keeter,* 74 S.W.3d at 37. Appellee made no such showing here.

Further, while the motion for new trial recites each of the four *Keeter* factors, the motion does not apply these factors. Specifically, the motion provides no factual basis to support a conclusion that counsel was diligent. At the hearing on the motion for new trial, counsel offered no evidence or explanation as to why he was not aware of the fingernail clippings until the

medical examiner testified at trial, given he had two separate opportunities. Further, there is no explanation or discussion of this factor in appellee's brief.

Therefore, on this record, we conclude appellee did not meet his burden to show that the failure to discover the evidence in question did not result from a lack of diligence.

In view of our resolution of the first two prongs of the *Keeter* test, we need not address and express no opinion on the remaining *Keeter* factors.

**No *Brady* violation**

Appellee also contends the trial court impliedly found the State's failure to test the fingernail clippings constituted a *Brady* violation. There is nothing in the record to support this contention. Although appellee argued at trial that the State's failure to notify him of Malesky's changing version of events constituted a *Brady* violation, the trial court overruled this objection. There was no argument that the State somehow should have disclosed the results of a test that had not been performed, or that there was a *Brady* violation of any kind in connection with this evidence.

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also Ex parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012). To establish a claim under *Brady,* a defendant must demonstrate "(1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; [and] (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different." *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). *Brady* and its progeny do not require the State to conduct independent investigations to seek out

*Brady* material on behalf of a defendant. *See Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006). And there is no duty to disclose evidence of which the defendant was aware or other evidence if the defendant "could have accessed it from other sources." *Pena v. State*, 353 S.W.3d 797, 809 n.10 (Tex. Crim. App. 2011).

The autopsy report referencing the fingernail clippings was turned over to the defense well in advance of trial. As a result, there was no *Brady* violation, and we decline appellee's invitation to hold otherwise. *See Jones v. State*, 234 S.W.3d 151, 158 (Tex. App.—San Antonio 2007, no pet.).

Finally, appellee argues that the trial court granted the motion for new trial "in the interest of justice." Appellee's motion for new trial, however, did not seek a new trial on this ground. There was no "interest of justice" argument at the hearing. And the trial court did not state, or even suggest that the new trial was granted for any reason other than the newly discovered evidence. Under these circumstances, we decline to adapt a rationale for the trial court's ruling that has no support in the record.

Appellee did not meet his burden to establish the *Keeter* factors justified the granting of a new trial based on newly discovered evidence. Therefore, the trial court erred in granting the new trial. The State's issue is sustained.

**Appellee's Cross-points**

Appellee also seeks review of seven cross-points of error. The State contends we have no jurisdiction to consider these cross-points in this state's appeal.

As previously discussed, article 41.02 describes the circumstances in which the State may appeal. *See* TEX. CODE CRIM. PROC. ANN. art. 41.02. With regard to such appeals, subsection (j) provides, in pertinent part that, "Nothing in this article is to interfere with the defendant's right to

appeal under the procedures of Article 44.02 of this code."[3]  But there is nothing in article 41.02 that affords a defendant the right to cross-appeal in a state's appeal. *See id.*; *see also State v. Kost*, 785 S.W.2d 936, 940 (Tex. App.—San Antonio 1990, pet. ref'd) (denying cross-appeal in state's appeal of motion to suppress); *State v. Vogel*, 852 S.W.2d 567, 570 (Tex. App.—Dallas 1992, pet. ref'd) (same). Indeed, the sole entitlement to raise a cross-point in criminal appeals is found in the provision allowing the State to raise a cross-point on a question of law when the defendant is convicted and appeals. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(c) (West 2012); *Gelo v. State*, 1 S.W.3d 703, 705 (Tex. App.—El Paso 1999, no pet.).

In the instant case, the trial court's judgment was signed on December 5, 2011. Appellee filed a generic notice of appeal the same day. On January 25, 2012, the trial court signed the order granting appellee's motion for new trial. An order granting a new trial restores the case to its position before the former trial and there is no longer a judgment in place. *See* TEX. R. APP. P. 21.9(b); *Waller v. State*, 931 S.W.2d 640, 643–44 (Tex. App.—Dallas 1996, no pet.). Thus, when the order granting the new trial was signed, there was no longer a judgment in place from which appellee could appeal.

In presenting his cross-points, appellee does not provide a jurisdictional statement or argue his right to cross-appeal under article 44.01. In the absence of a judgment of conviction, we have no jurisdiction over appellee's cross-points on appeal. *Waller*, 931 S.W.2d at 644. Therefore, we dismiss appellee's cross-points for lack of jurisdiction.

**CONCLUSION**

---

[3] Article 44.02 generally provides that a defendant in a criminal action has a right of appeal. *See* TEX. CODE CRIM. PROC. ANN. art. 44.02 (West Supp. 2012).

The State's sole issue is sustained and appellee's cross-points are dismissed for lack of jurisdiction. We vacate the trial court's order granting a new trial and reinstate the trial court's judgment of conviction.

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
120154F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-12-00154-CR          V.

TERRANCE GERMAINE WILKINS,
Appellee

On Appeal from the Criminal District Court
No. 6, Dallas County, Texas
Trial Court Cause No. F10-62224-X.
Opinion delivered by Justice FitzGerald.
Justices Bridges and Myers participating.

Based on the Court's opinion of this date, the trial court's order granting a new trial is **VACATED** and the judgment of conviction is **REINSTATED.**

Judgment entered February 4, 2014

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE