**Derrick MORRIS, Appellant**

v.

**The STATE of Texas, Appellee**

**NO. 01-16-00330-CR**

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued August 24, 2017

Discretionary Review Refused
January 10, 2018

Joseph W. Varela, 2500 East T.C. Jester Blvd, Suite 247, Houston, TX 77008, for Appellant.

Kim Ogg, District Attorney, Katie Davis, Assistant District Attorney, Harris County, Texas, 1201 Franklin, Suite 600, Houston, TX 77002, for Appellee.

Panel consists of Justices Jennings, Higley, and Massengale.

## OPINION

Michael Massengale, Justice

A jury convicted appellant Derrick Morris of assault on a family member as a second offense.[1] During the jury's deliberation on punishment, Morris moved for a mistrial, alleging that the State failed to disclose exculpatory material during the punishment phase of trial in violation of *Brady v. Maryland*.[2] The trial court denied this motion. The jury found enhancement allegations to be true and assessed a 50-year prison term as punishment.[3]

On appeal, Morris raises two issues, solely challenging the outcome of the punishment phase of trial. First, he contends that the trial court erred by denying his motion for a punishment mistrial because of the alleged *Brady* violation. Second, he argues that the trial court erred by allowing the State to call a witness solely for the purpose of impeaching her testimony.

We affirm the trial court's judgment.

## Background

The complainant, S. Rose, worked as a teacher in Harris County. Although appellant Derrick Morris had a common-law marriage with another woman, Rose dated him for over two years before they ended their relationship. About three months later, Morris called Rose numerous times while she was at work. Rose left work without answering the phone calls. After leaving work, while Rose was waiting at a bus stop, Morris approached in his car and got out. He punched Rose and forced her into the car. Morris punched Rose several more times in the car, and he threatened to kill her.

Afraid for her life, Rose jumped out of the moving car and ran across an open field to a discount store. Morris followed in his vehicle, across the field, and then he chased her on foot into the store. At the store, several bystanders intervened and stopped Morris from removing Rose from

---

1. *See* TEX. PENAL CODE § 22.01(b)(2)(A).

2. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

3. *See* TEX. PENAL CODE §§ 12.42(d), 22.01(b)(2)(A).

the store. Morris then fled the scene before police arrived.

A grand jury indicted Morris for the offense of assault on a family member, second offense. The indictment included two enhancement paragraphs alleging that Morris previously had been convicted of aggravated assault and retaliation. After a trial on the merits, a jury convicted Morris of assault on a family member.

During the trial's punishment phase, the State called several witnesses to testify about Morris's previous felony convictions. A fingerprint expert testified that Morris's fingerprints matched those found on the judgments, including a previous conviction for assault on a family member in 2007.

Following the testimony of the fingerprint expert, the State called Morris's common-law wife, Nicole Miller, to testify about her role in the 2007 conviction for assault on a family member. Miller initially testified that an unknown assailant attacked her and that when interviewed in the hospital following the assault, she told police it was an unknown person. The State then asked if she ever told the police a different story. Defense counsel objected, contending that the State had called Miller solely for the purpose of impeaching her with a prior inconsistent statement. The trial court overruled this objection, and the State asked to designate Miller as a hostile witness. Miller testified that she had given a statement to the police alleging that Morris was the attacker. She further testified that the reason she told police that Morris attacked her was because she "was upset" and had "found out he had moved on, was happy," while she "was not." Miller affirmatively stated that Morris never attacked her.

On cross-examination, Miller testified about her relationship with Morris and how much he meant to her. She also testified that she gave a written statement to the police about the assault in 2007. On redirect examination, the State offered into evidence the written statement, dated November 13, 2007, in which Miller alleged that Morris was the person who attacked her.

In addition to Miller, the State called several other witnesses during the punishment phase. The complainant, Rose, and her mother testified about an incident that occurred after the charged offense. Morris came to Rose's apartment, kicked in the door, and threatened them with a gun. The State also called several police officers who testified about other criminal investigations involving Morris.

While the jury deliberated on punishment, Morris moved for a mistrial based on an alleged *Brady* violation. He argued that the State had withheld another statement written by Miller about the 2007 assault, an affidavit dated May 23, 2008, as well as a *Brady* notice filed in the course of the prosecution of that offense. The *Brady* notice disclosed that in an August 21, 2007 conversation with a police officer, Miller "insisted" that Morris "did not assault her, that she was robbed by an unknown person and wanted nothing more to do with the case." In the 2008 affidavit, Miller averred that Morris was not the person who attacked her in 2007. The affidavit included Miller's reasons why she told the police Morris had attacked her. These reasons included, among others, that she was "depressed," she "blamed him for what happened" to her, and she "wanted him to feel the same way." After a hearing, the trial court denied Morris's motion for a mistrial.

The jury found the two enhancement paragraphs to be true and assessed punishment at imprisonment for 50 years. Morris appealed.

## Analysis

On appeal, Morris raises two issues challenging the punishment phase of his trial. First, he contends that the trial court erred by denying his motion for a mistrial based on the State's alleged suppression of exculpatory evidence in violation of *Brady*. Second, he argues that the trial court erred by admitting Miller's testimony during the punishment phase and a written statement she gave to police in which she accused Morris of attacking her in 2007.

## I. Denial of mistrial for alleged suppression of exculpatory evidence

In his first issue, Morris contends that the trial court erred by denying his motion for a mistrial as to the punishment phase of trial based on an allegation that exculpatory materials were withheld by the State in violation of *Brady v. Maryland*.[4]

We review a trial court's ruling on a motion for a mistrial under an abuse-of-discretion standard.[5] We "must uphold the trial court's ruling if it was within the zone of reasonable disagreement."[6] "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required."[7]

The suppression of evidence favorable to a defendant violates his due-process rights if the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution.[8] To establish a *Brady* violation, a defendant must show: (1) the State suppressed evidence; (2) the suppressed evidence is favorable to the defendant; and (3) the suppressed evidence is material.[9]

The materiality prong incorporates a requirement that the defendant "must be prejudiced by the state's failure to disclose the favorable evidence."[10] "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."[11] The strength of the suppressed evidence must be balanced against the evidence supporting the verdict.[12] Under the U.S. Supreme Court's holding in *United States v. Bagley*, "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."[13] Thus, the standard we apply "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial

---

4. 373 U.S. at 87, 83 S.Ct. at 1196–97.

5. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

6. *Id.*

7. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

8. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97.

9. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999).

10. *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006) (en banc) (citing *Banks v.*

*Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004)).

11. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002) (quoting *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976)).

12. *See Pena v. State*, 353 S.W.3d 797, 812 (Tex. Crim. App. 2011).

13. 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (referencing the materiality standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

resulting in a verdict worthy of confidence."[14] "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"[15]

On appeal, Morris argues that the State violated *Brady* by failing to disclose the affidavit in which Miller denied his involvement in the 2007 assault against her. During the punishment phase, the State called Miller to testify about an assault on her in 2007. During direct examination, Miller initially testified that she was attacked by an unknown assailant and that she so informed police afterwards. The State asked Miller if she had ever told the police anything different. She then testified that on another occasion she told the police that Morris was the person who attacked her. During her trial testimony, however, Miller maintained that Morris was not the person who attacked her. She testified that she told police Morris attacked her because she was "upset," having "found out he had moved on" and "was happy," while she "was not." She also said she had "pressure" from her family. Still, she asserted that Morris "never assaulted" her.

On cross-examination, Miller reiterated that she was "mugged or assaulted by a stranger" in 2007. She testified that she cared for Morris, her husband, and she continued to "stand by him." On redirect examination, the State introduced the November 13, 2007 written statement Miller gave to the police in which she described how Morris attacked her in 2007. On further cross-examination, Miller again testified that the statement she made about Morris attacking her in 2007 was not true,

and she only wrote it because they "had broken up" and he had been "able to move on" and she had not. She also testified that at the time she was "homeless basically," living in a women's shelter.

In Miller's 2008 affidavit that Morris argues the State improperly suppressed, she averred that she did not want to press charges against him because he had not attacked her. She further stated that she told the police Morris attacked her because she was "depressed," "blamed him" for what happened to her, and wanted him to feel as hurt as she did when he left her. She also indicated that she had pressure from her family to accuse Morris of attacking her.

The State does not dispute the first and second prongs of the *Brady* analysis, that it suppressed Miller's 2008 affidavit, which was favorable to Morris. Instead, the State contends that the affidavit was not material.

With respect to materiality, Morris argues that besides the complainant, Miller was the only witness who testified about other instances in which he allegedly committed family violence. As a result, Morris maintains that if he had been provided Miller's statement, "which not only indicated that she lied" when accusing him, but also "revealed her motive for doing so," his counsel "could have effectively impeached Miller and the jury would have discounted her testimony."

The affidavit was favorable to Morris to the extent it supported Miller's trial testimony that he was not the person who attacked her in 2007. But in substance, essentially the same evidence was produced at trial as that contained in the

---

**14.** *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995); *see also Turner v. United States*, — U.S. —, 137 S.Ct. 1885, 1893, 198 L.Ed.2d 443 (2017).

**15.** *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381); *see also Turner*, 137 S.Ct. at 1893.

suppressed affidavit. To the extent the defense objective was to rebut evidence about the assault on Miller by relying on her testimony denying the incident, counsel was able to offer the substance of that rebuttal without the affidavit.

If the affidavit had been available to defense counsel for use during trial, it could have been used in an attempt to corroborate Miller's trial testimony. But when information is introduced at trial that is "materially the same" as impeachment evidence the State allegedly has suppressed, then the evidence is not material.[16] Relatedly, if a witness acknowledges "impeaching facts" during her testimony, nondisclosed evidence corroborating those same facts is "not 'material' under *Bagley*."[17]

In *Wyatt v. State*, the defendant was convicted of capital murder and sentenced to death.[18] On appeal, he argued that the trial court violated *Brady* by not requiring the State to produce an exculpatory statement by the victim's mother until after she was called as a witness.[19] The statement was contained in a pathologist's report, which stated that the mother of the victim "denies boyfriend ever hurt deceased or would sexually assault him."[20] Although the State did not produce this statement to the defendant, the mother testified that she trusted the defendant, the "boyfriend"

referenced in the report, and she "did not believe he would have hurt her child."[21] The Court of Criminal Appeals considered this information "materially the same" as that contained in the pathologist's report and therefore concluded that the statement in the report was not material.[22]

In this case, on direct examination, Miller stated several times that Morris had not been the person who attacked her in 2007. In addition, she explained why she told the police that he was the person who attacked her, and those reasons were similar to those expressed in the undisclosed affidavit. Defense counsel was able to question Miller about why she told the police Morris attacked her. Thus, through Miller's testimony, the jury was presented with materially the same information as that contained in her 2008 affidavit. Even without Miller's affidavit, Morris was able to present evidence through her testimony that she lied about him assaulting her, including some of the reasons why she lied. Thus, Morris was able to "reveal" the witness's motive for her prior inconsistent statement, as he claims on appeal he could have done with the statement.[23]

Furthermore, in "evaluating whether the materiality standard is satisfied, the strength of the exculpatory evidence is balanced against the evidence supporting"

16. *See Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000); *Etheridge v. State*, 903 S.W.2d 1, 20 (Tex. Crim. App. 1994), *superseded by statute on other grounds as stated in Diaz v. State*, 110 S.W.3d 181, 184 (Tex. App.—San Antonio 2003, pet. ref'd); *Pitman v. State*, 372 S.W.3d 261, 272–73 (Tex. App.—Fort Worth 2012, pet. ref'd); *see also Higginbotham v. State*, 416 S.W.3d 921, 926–27 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Saldivar v. State*, 980 S.W.2d 475, 486–87 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd).

17. *Pitman*, 372 S.W.3d at 272–73 (quoting 42 George E. Dix & John M. Schmolesky, *Tex-*

*as Practice Series: Criminal Practice & Procedure* § 27:19 (3d ed. 2011)); *see Higginbotham*, 416 S.W.3d at 926–27; *Saldivar*, 980 S.W.2d at 486–87; *see also Etheridge*, 903 S.W.2d at 20.

18. 23 S.W.3d 18, 21 (Tex. Crim. App. 2000).

19. *Id.* at 26.

20. *Id.* at 27.

21. *Id.*

22. *Id.*

23. *See Saldivar*, 980 S.W.2d at 486–87.

the outcome.[24] In both *Higginbotham v. State*[25] and *Saldivar v. State*,[26] this court concluded that undisclosed information was immaterial, partially based upon the fact that similar information was presented at trial.[27] In both of those cases, the court also noted that the State's case against the defendant was strong.[28] Likewise, the State's punishment evidence against Morris in this case was strong.

During the punishment phase, a Harris County Sheriff's Deputy testified about penitentiary packets admitted into evidence which contained judgments from ten of Morris's prior convictions. The previous offenses included theft, retaliation, two aggravated assaults, possession of cocaine, unlawfully carrying a weapon, two assaults of a family member, evading arrest, and trespass.

Rose testified that after she was assaulted by Morris, her mother had to take her to the hospital, and she eventually underwent three surgeries. After she was released from the hospital, Morris came to her apartment and kicked in her front door. While Rose hid in a bathroom, she could hear Morris profanely asking her mother about her whereabouts and suggesting that she "set [him] up." She heard her mother screaming for help and calling for emergency assistance. After these events, Morris continued to harass and threaten her. Rose also testified that she could not recall how many times Morris had assaulted her during their relationship, because it occurred so frequently. For example, she testified about an incident prior to the charged offense, in which she did not pursue criminal charges against Morris, although he "mushed" her

"in the face" and took her bag with her money in it.

Rose's mother also testified during the punishment phase. She described how Rose had to go to the hospital because Morris had "abducted her." She also testified about the incident following Rose's release from the hospital. She described how Morris came to Rose's apartment, kicked in the door, and threatened to kill them with a gun. Morris left the apartment after he knocked items off of a bar, knocked over a Christmas tree, and broke a television.

In addition to Rose and her mother, a police officer testified about his investigation into Morris's invasion of Rose's apartment. He testified that he found "the whole front side of the door frame was kicked in." He saw a Christmas tree that appeared to have been thrown, a shattered television, and a hole in the wall. Rose's mother reported to him that Morris came into the apartment, pointed a gun at her, and then destroyed the living room. The officer also noted that Morris had an "open warrant for kidnapping."

The State called another police officer who investigated a complaint of criminal mischief which occurred prior to Morris's abduction of and assault on Rose. When the officer arrived at the scene of the complaint, a woman came running toward him and identified Morris, her boyfriend at the time, as the perpetrator. The woman was very scared that Morris might still be on the property. The officer noted that all four tires on her automobile had been cut with a knife.

24. *See Pena,* 353 S.W.3d at 812.

25. 416 S.W.3d at 926–27.

26. 980 S.W.2d at 485–87.

27. *See Higginbotham,* 416 S.W.3d at 926–27; *Saldivar,* 980 S.W.2d at 485–87.

28. *See Higginbotham,* 416 S.W.3d at 926; *Saldivar,* 980 S.W.2d at 487.

One of Morris's prior convictions was for an assault against Miller, with whom he had been in a relationship for over three years prior to the offense. In a written "victim/witness statement" to police dated November 13, 2007, Miller accused Morris of beating her with his fist and kicking her while she laid "in a ball on the floor," trying to protect her face. He twisted her arm behind her, breaking it. She was hospitalized beginning on "7/21" with face fractures and a broken arm. Morris pleaded guilty to the offense of "assault-family member," which occurred on July 21, 2007. He was sentenced to one year of confinement in county jail. Thus to the extent Miller's 2008 affidavit was "made closer in time to the event in question" and arguably could have been considered to have stronger "indicia of trustworthiness" than Miller's trial testimony,[29] the evidence even closer in time to the assault supported Morris's conviction as the perpetrator of the assault.

The jury was presented with materially the same information through Miller's testimony disputing Morris's identity as her attacker as was also contained in her affidavit.[30] Considering the marginal additional value of the affidavit as balanced against the entire body of evidence informing the jury's punishment determination, including the evidence that Morris pleaded guilty to the charge that he assaulted Miller, we hold that there was not a "reasonable probability" that the outcome of the punishment phase would have been different had the affidavit been available to the defense for use at trial.[31] When suppressed Brady material had no reasonable probability of affecting the outcome of the trial, it was not "material" in the sense relevant to Brady.[32] We conclude that the unavailability of Miller's 2008 affidavit to the defense did not undermine the fairness of the trial or confidence in the outcome. Thus the trial court did not abuse its discretion in denying a mistrial, and we overrule Morris's first issue.

## II. Testimony for impeachment purposes only

In his second issue, Morris contends that the trial court erred by permitting the State to call a witness for the sole purpose of impeachment.

A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion.[33] A trial court abuses its discretion when it acts arbitrarily and unreasonably, without reference to any guiding rules or principles.[34] A trial court's evidentiary ruling will not be reversed unless that ruling falls outside the zone of reasonable disagreement.[35]

Morris contends that "the State is precluded from calling a witness for the sole purpose of impeaching that witness," and he argues that the State improperly called Miller solely so it could impeach her with a prior inconsistent statement. In support of this contention, Morris relies upon Lewis v. State[36] and Hughes v. State.[37] Morris's reliance upon these cases is misplaced.

29. See, e.g., Fernandez v. State, 805 S.W.2d 451, 455 n.3 (Tex. Crim. App. 1991).

30. See Wyatt, 23 S.W.3d at 27.

31. See Higginbotham, 416 S.W.3d at 927.

32. See Pena, 353 S.W.3d at 812.

33. Shuffield v. State, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006); Smith v. State, 340 S.W.3d 41, 53 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

34. Montgomery v. State, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990); Smith, 340 S.W.3d at 53–54.

35. Torres v. State, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002).

36. 593 S.W.2d 704 (Tex. Crim. App. [Panel Op.] 1980).

In *Lewis*, the Court of Criminal Appeals applied the common-law "voucher rule" that prohibited a party from impeaching its own witness unless the witness testified to "facts injurious to that party's case" and the party demonstrated it was surprised by such testimony.[38] Texas courts abandoned the "voucher rule" upon the adoption of Rule 607, which allows "any party, including the party calling the witness," to attack the "credibility of a witness."[39] Thus *Lewis* is inapplicable to this case.

In *Hughes*, the Court of Criminal Appeals refused to allow impeachment by prior inconsistent statements to be used "as a mere subterfuge to get before the jury evidence not otherwise admissible."[40] The court, however, did not prohibit a party from calling a witness solely for impeachment purposes. Instead, it determined that a court should analyze whether such impeachment should be allowed under Rule 403. The court held that a party's "knowledge that its own witness will testify unfavorably is a factor the trial court must consider when determining whether the evidence is admissible under Rule 403."[41] In other words, the party's knowledge should be considered when determining if the impeachment evidence should be excluded because its probative value is substantially outweighed by its prejudicial effect.[42]

Morris did not object to Miller's testimony on the basis of Rule 403. The sole premise of his objection was that a witness may not be called solely for the purpose of impeaching her credibility. In the absence of any other objection suggesting the inadmissibility of Miller's prior inconsistent statement, this was not a valid objection to the State calling her as a witness.[43] Indeed, the State is authorized to introduce the underlying facts of an extraneous offense during the punishment phase of a trial.[44]

We overrule Morris's second issue.

### Conclusion

We affirm the judgment of the trial court.

37. 4 S.W.3d 1 (Tex. Crim. App. 1999).

38. 593 S.W.2d at 706; *see also Hughes*, 4 S.W.3d at 5 & nn. 6 & 7.

39. Tex. R. Evid. 607; *see Hughes*, 4 S.W.3d at 5.

40. *Hughes*, 4 S.W.3d at 4 (quoting *Pruitt v. State*, 770 S.W.2d 909, 911 (Tex. App.—Fort Worth 1989, pet. ref'd)).

41. *Id.*

42. *Id.; see* Tex. R. Evid. 403.

43. *See* Tex. R. Evid. 607.

44. *See* Tex. Code Crim. Proc. art. 37.07, § 3(a)(1); *Davis v. State*, 968 S.W.2d 368, 373 (Tex. Crim. App. 1998).