

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-17-00193-CR

Michael Jerome **BOYD**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CR9887
Honorable Steve Hilbig, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Karen Angelini, Justice
Marialyn Barnard, Justice
Rebeca C. Martinez, Justice[1]

Delivered and Filed:  June 27, 2018

AFFIRMED

A jury convicted appellant Michael Jerome Boyd of possession with intent to deliver a

controlled substance, namely cocaine, in an amount of four grams or more but less than 200 grams.

The trial court sentenced Boyd to thirty years' confinement.  On appeal, Boyd contends: (1) the

evidence is legally insufficient to support the conviction; (2) the trial court erred in denying his

motion to require the State to disclose its confidential informant; and (3) the State committed a

---

[1] Joins in the opinion with respect to issues one and two, but concurs in the judgment only with respect to issue three.

*Brady* violation by failing to provide him with the identity of the owner of a firearm found when he was arrested. We affirm the trial court's judgment.

## BACKGROUND

Deputy Alexander Uriegas, who works undercover in the narcotics unit of the Bexar County Sheriff's Office ("BCSO"), received information from a confidential informant that Boyd was selling narcotics from a room at the Travel Inn. Ultimately, Deputy Uriegas obtained a search warrant for the room. Thereafter, Deputy Uriegas and others from the BCSO conducted a search of the room, finding what the deputy believed to be crack cocaine in the ceiling above the bathroom vanity. He also found a loaded firearm.

After deputies determined a woman and children who were in the room were not involved with the drugs, they released them and arrested Boyd for possession of a controlled substance. Subsequent testing showed the substance found by Deputy Uriegas to be "cocaine (free alkaloid)," weighing 39.832 grams.

A grand jury indicted Boyd for one count of possession with intent to deliver a controlled substance, namely cocaine, in an amount greater than four grams, but less than 200 grams, and one count of simple possession of the same controlled substance in the same amount. The indictment also included a deadly weapon allegation. After a jury trial, the jury found Boyd guilty only of possession with intent to deliver; it declined to make an affirmative deadly weapon finding. The jury recommended a sentence of thirty years. After the trial court rendered judgment in accordance with the jury's verdict, Boyd perfected this appeal.

## ANALYSIS

As stated in our introduction, Boyd raises three issues on appeal. First, he contends the trial court erred in not granting his motion for a directed verdict because the evidence is legally insufficient to establish he exercised care, custody, control, or management over the controlled

substance or that he had intent to deliver the controlled substance to another. Second, Boyd asserts the trial court erred in refusing to grant his request to require the State to disclose its confidential informant pursuant to Rule 508 of the Texas Rules of Evidence. Finally, he contends the State committed a *Brady* violation by failing to disclose the identity of the owner of the firearm found at the time of the search.

### *Directed Verdict — Legal Sufficiency*

Boyd first argues the trial court erred in denying his motion for directed verdict. He contends he was entitled to a directed verdict because the evidence is legally insufficient to support his conviction. More specifically, he contends the evidence is legally insufficient to establish he: (1) exercised care, custody, control, or management over the cocaine; and (2) had intent to deliver the cocaine to another person.

### *Standard of Review*

We review a challenge to a trial court's denial of a motion for directed verdict under the same standard we use to review a legal sufficiency challenge. *Hines v. State*, 383 S.W.3d 615, 623 (Tex. App.—San Antonio 2012, pet. ref'd); *Sony v. State*, 307 S.W.3d 348, 353 (Tex. App.—San Antonio 2009, no pet.) (citing *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996)). To determine whether the evidence is legally sufficient to support a conviction, we must examine all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Harris v. State*, 532 S.W.3d 524, 527 (Tex. App.—San Antonio 2017, no pet.). In a sufficiency review, direct and circumstantial evidence are equally probative. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016); *Harris*, 532 S.W.3d at 527. Circumstantial evidence, even in the absence of

direct evidence, may be sufficient to uphold a conviction as long as the cumulative force of the evidence is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809–10 (Tex. Crim. App. 2015); *Harris*, 532 S.W.3d at 527.

Under this standard, we must defer to the jury's determinations as to credibility and weight because the jury is the sole judge of witness credibility and the weight to be afforded a witness's testimony. *Cary*, 507 S.W.3d at 757; *Huff v. State*, 467 S.W.3d 11, 19–20 (Tex. App.—San Antonio 2015, pet. ref'd). Additionally, we must assume the jury resolved any apparent inconsistencies in testimony in order to render its verdict, and we defer to its resolution of such inconsistencies. *Cary*, 507 S.W.3d at 757; *Meza*, No. 04-1-00735-CR, 2017 WL 4533704, at *9 (Tex. App.—San Antonio Oct. 4, 2017, no pet.). As fact finders, jurors can choose to believe some, all, or none of the testimony provided by any witness, and give different weight to different testimony if they choose. *Meza*, 2017 WL 4533704, at *9 (citing *Baez v. State*, 486 S.W.3d 592, 594 (Tex. App.—San Antonio 2016, pet. ref'd) (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)). Moreover, jurors may draw multiple reasonable inferences from the facts as long as the evidence supports each inference. *Tate*, 500 S.W.3d at 413; *Harris*, 532 S.W.3d at 528.

### Applicable Law

To establish possession of a controlled substance with intent to deliver as charged in this case, the State had to prove Boyd knowingly possessed, with intent to deliver, a controlled substance in an amount greater than four grams but less than 200 grams. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a), (d) (West 2017). Possession of a controlled substance is defined as having actual care, custody, control, or management over the controlled substance. *Id.* § 481.002(38)

If the controlled substance is not in the defendant's exclusive possession, as in this case, the State must — to establish the element of possession — produce evidence affirmatively linking the defendant to the controlled substance. *See Tate*, 500 S.W.3d at 413–14; *Hargrove v. State*, 211 S.W.3d 379, 385 (Tex. App.—San Antonio 2006, pet. ref'd). A jury may infer the defendant intentionally or knowingly possessed a controlled substance "if there are sufficient independent facts and circumstances justifying such an inference."[2] The purpose of requiring the State to link the defendant to the controlled substance is to protect innocent bystanders from conviction based solely on their fortuitous proximity to the narcotics. *Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005). Thus, mere presence at the location where the drugs are found is insufficient to establish possession, i.e., affirmatively link the defendant to the narcotics. *Evans*, 202 S.W.3d at 162; *Poindexter*, 153 S.W.3d at 405 n.11 (citing *United States v. Phillips*, 496 F.2d 1395, 1397 (5th Cir. 1974)). "However, presence or proximity, when combined with other evidence, either direct or circumstantial (e.g., 'links'), may well be sufficient to establish that element beyond a reasonable doubt." *Evans*, 202 S.W.3d at 162. Moreover, it is not the number of links that is dispositive, but the logical force of the direct and circumstantial evidence. *Id.*

The Texas Court of Criminal Appeals has delineated a set of non-exclusive factors a reviewing court may consider when deciding whether there is sufficient evidence linking a defendant to a controlled substance for purposes of establishing possession:

(1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted

---

[2] As recognized by the Texas Court of Criminal Appeals, the "affirmative-links analysis is not a distinct rule of legal sufficiency." The analysis is merely a "helpful guide" in applying the legal sufficiency standard of review when, as here, the evidence of possession is circumstantial. *Tate*, 500 S.W.3d at 414 n.6 (citing *Evans v. State*, 202 S.W.3d 158, 161 n.9 (Tex. Crim. App. 2006)).

to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Tate*, 500 S.W.3d at 414; *Evans*, 202 S.W.3d at 162 n.12. The court of criminal appeals has held it is not the number of links that is dispositive, but rather the logical force of all of the evidence, direct or circumstantial. *Evans*, 202 S.W.3d at 162. In other words, the absence of certain links is not evidence of innocence to be weighed against the links present because the factors are merely a guide in our sufficiency analysis; rather, the ultimate inquiry remains: "Based on the combined and cumulative force of the evidence and any reasonable inference therefrom, was a jury rationally justified in finding guilt beyond a reasonable doubt?" *Tate*, 400 S.W.3d at 414 (citing *Jackson*, 443 U.S. at 318–19).

*The Evidence*

This matter began when Deputy Uriegas received information from a confidential informant that Boyd was selling crack cocaine from room #230 at a particular Travel Inn in Bexar County, Texas. According to the deputy, the informant advised that he had seen Boyd conduct narcotics transactions in room #230. Deputy Uriegas testified his informant has assisted the BCSO in the past — "has given us cases" — and has been "credible and reliable." When the informant told him about Boyd, Deputy Uriegas pulled up a picture of Boyd on his computer and verified with the informant that this was the person who was selling narcotics out of room #230 of the Travel Inn. After the informant verified Boyd's identity, Deputy Uriegas and the informant drove by the Travel Inn in an unmarked vehicle, and the informant identified Boyd's car. He also pointed out the specific room Boyd was using at the Travel Inn. Deputy Uriegas testified the area in which the Travel Inn is located is a "known narcotics area," meaning it is known to law enforcement for

drug trafficking. As they drove by the Travel Inn, the deputy saw Boyd outside, and the informant once again identified him as the person selling crack cocaine out of the motel. At trial, the deputy identified Boyd as the man identified by the informant and as the man he saw outside the Travel Inn.

The evidence shows that after the drive-by, Deputy Uriegas and the informant left the motel. Later, the deputy and his partner returned to the Travel Inn to conduct surveillance. According to Deputy Uriegas, their surveillance lasted "a little over 24 hours." Although they saw "moderate" traffic going in and out of Boyd's room, they did not see Boyd at the motel during their surveillance. Nor did they witness any hand-to-hand transactions. However, the vehicle identified by the informant as belonging to Boyd was there during the surveillance period. Ultimately, the deputies left to discuss the situation with their supervisor. Thereafter, Deputy Uriegas prepared an affidavit in order to obtain a search warrant for room #230 of the Travel Inn, the room identified by the confidential informant as the one from which Boyd was selling crack cocaine, and the vehicle identified as belonging to Boyd. A judge signed the requested search warrant, permitting authorities to search room #230 at the Travel Inn and Boyd's vehicle.

While Deputy Uriegas was obtaining the warrant, Sergeant James Hancock of the BCSO maintained surveillance on room #230. At trial he testified that during his surveillance, he saw Boyd come out of the room several times. At one point, Boyd came out of the room and placed an item, which was wrapped in a plastic bag, into the trunk of his vehicle, the vehicle identified by the informant as belonging to Boyd.

After obtaining the warrant, Deputy Uriegas and six other members of the BCSO executed the warrant. They retrieved a room key from the motel manager — one deputy remained with the manager while the others went to room #230. When they got to the room, they knocked on the door, identified themselves, and stated they had a search warrant. There was no answer so they

entered the room using the key provided by the manager. In the room they found Boyd, a woman, and several young children on the beds. All of the individuals in the room were, according to the deputy, "pretty much, like, in their — in their underwear[.]" The room contained clothing, food, and other items that suggested to Deputy Uriegas that the individuals had been living in the motel room for an extended amount of time.

After they entered, the deputies identified themselves and read *Miranda* warnings and the search warrant to the individuals in the room. The adults were asked if there were any "narcotics, guns, booby traps, or anything that could hurt the — the officers while they're searching." Boyd and the female companion were also asked about large sums of cash, jewelry, etc. When the adults answered "no," the deputies began the search. The deputies searched the entire motel room and everything in the room. Boyd's vehicle was searched as well.

In the bathroom of the motel room, Deputy Uriegas noticed the ceiling tiles had been disturbed. He stood on the vanity and began removing the ceiling tiles. As he was doing so, a gun fell out of the ceiling. It was later determined the gun was loaded. Looking further into the ceiling area, he could see "a clear, plastic bag." In the corner of the bathroom he also saw "a little tool … [i]t had a little hook on it," like something used to grab items. He later clarified it might have been "a back scratcher or something." The deputy used the tool to retrieve the plastic bag hidden above the ceiling tiles. When he did, he recognized there was crack cocaine in the plastic bag.

When asked what other items were found in the room, Deputy Uriegas testified he found a glass Pyrex measuring cup. He later clarified, after referring to his report, that the Pyrex cup was found by another law enforcement official in the car that the informant stated belonged to Boyd. The cup was found by Sergeant Hancock, who had observed Boyd leaving the room and placing something wrapped in a bag into the trunk of the vehicle.

Deputy Uriegas testified that Pyrex cups like the one found by Sergeant Hancock "are used to manufacture crack cocaine from regular cocaine." He then described the process for turning regular cocaine into crack cocaine using a glass measuring cup. According to the deputy, the regular, powdered cocaine is placed into a glass measuring cup and then baking soda and hot water are added. The mixture is then heated in the cup and upon cooling, it becomes crack cocaine. The process turns the powdered cocaine into something hard that looks like "a sugar cookie." The deputy said the cocaine is altered to increase profits from selling the drug.

Sergeant Hancock found the Pyrex cup in the trunk of the vehicle. He testified the "cookie" of cocaine found by Deputy Uriegas fit into the bottom of the Pyrex cup found in the trunk of the vehicle, suggesting the crack cocaine was made in that Pyrex cup. Deputy Uriegas provided testimony regarding ten photographs that were admitted into evidence. The photographs were taken during the search. One of the photographs showed that the crack cocaine, which was shaped like a cookie, fit inside the Pyrex measuring cup. Testimony also established the "cookie" had some clean edges, as if it had been cut with a sharp implement. Deputies found two razor blades during the search. A photograph of the crack cocaine showed its edges had what Deputy Uriegas described as "clean cuts … like from the razor blades."

Deputy Uriegas testified he did not know whether the motel room was registered under Boyd's name or how long Boyd had been renting the room. He stated that in his experience, hotel or motel rooms used to sell drugs are not usually rented in the name of the person dealing drugs. He explained locations such as hotel or motel rooms are "trap locations" used for criminal activities by individuals who know not to place the rooms in their names. He admitted they did not find scales or packaging materials in the room. Deputy Uriegas also admitted he could not remember how much, if any, cash was found in the room.

In addition to testimony from Deputy Uriegas and Sergeant Hancock, the State also presented testimony from Esperanza Sidoa, a drug analyst with the Bexar County Criminal Investigation Laboratory. She testified that she tested the substance found by deputies in Boyd's room — the substance Deputy Uriegas believed was crack cocaine. Based on her analysis, the substance found was "cocaine (free alkaloid)," meaning it was in freebase form, which has a lower melting point. The cocaine measured 39.832 grams. According to Deputy Uriegas, the amount of crack cocaine found in room #230 has a street value of approximately $3,900.00 to $4,000.00. However, if it is broken down and sold by the gram, it could be worth more, selling anywhere from $60.00 to $120.00 per gram. The deputy further testified that based on his training and experience, the amount of crack cocaine found suggested it was not for personal consumption, but for distribution or sale. Sergeant Hancock echoed this testimony, stating the amount of crack cocaine found would be for commercial as opposed to personal use.

*Application*

In this case, the narcotics were not in Boyd's exclusive possession — there was an adult female and several children in the room where the narcotics were found. Thus, the State was required to affirmatively link Boyd to the narcotics. *See Tate*, 500 S.W.3d at 413–14; *Hargrove*, 211 S.W.3d at 385.

A confidential informant, who Deputy Uriegas testified was credible and reliable, told the deputy that Boyd was selling narcotics — specifically crack cocaine — out of room #230 of the Travel Inn. Deputy Uriegas described the location of the Travel Inn as an active location for narcotics activity. Deputy Uriegas confirmed Boyd's identity through the informant, and thereafter conducted surveillance of the motel, noting traffic coming in and out of room #230.

After obtaining a warrant, deputies searched room #230 and found crack cocaine in the room. Although his presence alone is insufficient to establish possession, Boyd was in the room,

in his underwear, when and where the narcotics were found. Deputy Uriegas testified, based on items in the room, it appeared the individuals had been living in the room for some time. The jury could have reasonably inferred that Boyd had control over the room where the narcotics were found.

The narcotics were secreted in the ceiling above the bathroom vanity, along with a loaded firearm. Deputy Uriegas also found an implement or tool — not usually found in a hotel or motel — which could be used to retrieve the drugs pushed back above the ceiling tiles. Deputy Uriegas described how powdered cocaine is turned into crack cocaine by use of a glass measuring cup. Sergeant Hancock found a Pyrex measuring cup in Boyd's vehicle, and the "cookie" of crack cocaine fit into the bottom of the Pyrex cup. The "cookie" of crack cocaine had sharp edges, as if it had been cut; deputies found razor blades during the search.

We hold the State produced evidence affirmatively linking Boyd to the narcotics. *See Tate*, 500 S.W.3d at 413–14; *Hargrove*, 211 S.W.3d at 385. Taking into account the applicable standard of review, the factors used to determine the sufficiency of the evidence linking Boyd to the narcotics and the evidence, we hold "the combined and cumulative force of all admitted evidence," when viewed in the light most favorable to the verdict, is sufficient for the jury to have concluded Boyd possessed the narcotics. *See Tate*, 500 S.W.3d at 413.

Boyd also challenged the sufficiency of the evidence with regard to his alleged intent to distribute the narcotics found in his room. However, Esperanza Sidoa, the drug analyst from the Bexar County Criminal Investigation Laboratory, testified the crack cocaine found in the room had a weight of 39.832 grams. Deputy Uriegas testified this amount of crack cocaine has a street value of approximately $3,900.00 to $4,000.00. He further stated that if it is broken down — as suggested by the cuts to the "cookie" and the razor blades — it could be worth even more. Deputy Uriegas testified that based on his training and experience, the amount of crack cocaine found

suggested it was not for personal consumption, but for distribution or sale. Sergeant Hancock agreed, independently testifying that the amount of crack cocaine found in room #230 would be for "commercial" as opposed to personal use.

We hold this evidence is sufficient for the jury to find Boyd possessed the crack cocaine with the intent to deliver it to others. Accordingly, we hold the evidence is sufficient to support the jury's finding of guilt with regard to the offense of possession with intent to deliver a controlled substance. We overrule Boyd's first issue.

### *Disclosure of Confidential Informant — Texas Rule of Evidence 508*

Boyd next contends the trial court erred in denying his request to have the State disclose the name of the confidential informant. In support of his contention, Boyd argues: (1) the informant's testimony was necessary to a fair determination of his guilt or innocence, and therefore required under Rule 508 of the Texas Rules of Evidence; and (2) Deputy Uriegas's testimony about what the informant told him violated his rights under the Sixth Amendment's Confrontation Clause.

### *Preservation of Error — Confrontation Clause*

Before we analyze this issue, we note that Boyd did not assert an objection to Deputy Uriegas's testimony regarding the informant's information based on the Confrontation Clause. We have searched the record and the only objection made with regard to this issue was that disclosure of the informant was required pursuant to Rule 508 of the Rules of Evidence. Boyd did not object to the testimony about the informant based on a violation of the Confrontation Clause.

Generally, to preserve alleged error for appellate review, the complaining party must make a timely objection or other request apprising the trial court of the grounds for the objection.[3] TEX.

---

[3] The exceptions to the preservation rule are errors relating to absolute rights and non-forfeitable rights. *Grado*, 445 S.W.3d at 739. Neither is applicable to this issue.

R. APP. P. 33.1(a); *Grado v. State*, 445 S.W.3d 736, 739 (Tex. Crim. App. 2014); *Vidaurri v. State*, 49 S.W.3d 880, 885–86 (Tex. Crim. App. 2001). This is to give the trial court an opportunity to remedy any purported error. TEX. R. APP. P. 33.1(a); *Vidaurri*, 49 S.W.3d at 886. Failure to assert a proper objection waives appellate review of the matter. *See Vidaurri*, 49 S.W.3d at 886–87. Even constitutional errors are subject to waiver. *Grado*, 445 S.W.3d at 739. Here, the failure to object to an alleged Confrontation Clause error at trial waives the matter for appellate review. *See Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000); *Nickerson v. State*, 478 S.W.3d 744, 760 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *see also Reyna v. State*, 168 S.W.3d 173, 179 & n.29 (Tex. Crim. App. 2005) (holding hearsay objection did not preserve Confrontation Clause challenged on appeal). Accordingly, we hold Boyd has not preserved his argument relating to the Confrontation Clause for our review. We will, therefore, address the issue only with regard to Rule 508.

### *Standard of Review*

We review a trial court's denial of a motion to disclose the identity of a confidential informant for an abuse of discretion. *Taylor v. State*, 604 S.W.2d 175, 179 (Tex. Crim. App. 1980); *Perez v. State*, 414 S.W.3d 784, 789 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Blake v. State*, 125 S.W.3d 717, 728 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *Portillo v. State*, 117 S.W.3d 924, 928 (Tex. App.—Houston [14th Dist.] 2003, no pet.). A trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). A trial court does not abuse its discretion if some evidence supports its decision, *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002), or if its decision was correct on any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). We must consider all the circumstances of the case to determine whether the trial court abused its

discretion by not requiring the State to disclose the informant's identity. *Portillo*, 117 S.W.3d at 928.

Even if the trial court erred in refusing to require disclosure of an informant's identity, such error will be disregarded unless it affected the defendant's substantial rights. *Perez*, 414 S.W.3d at 789; *see* TEX. R. APP. P. 44.2(b). We disregard such error unless it affected the defendant's substantial rights because a trial court's failure to order disclosure of a confidential informant's identity is non constitutional error. *Perez*, 414 S.W.3d at 789 (citing *Sanchez v. State*, 98 S.W.3d 349, 356 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd)). A substantial right is affected when the error had a substantial or injurious affect or influence on the judgment. *Id.*

### Applicable Law

The Texas Rules of Evidence give the State the privilege to refuse to disclose the identity of a person who has furnished to law enforcement information relating to or assisting in an investigation of a possible violation of law. TEX. R. EVID. 508(a); *Williams v. State*, 62 S.W.3d 800, 802 (Tex. App.—San Antonio 2001, no pet.). The privilege is not absolute, and the rule provides several exceptions. TEX. R. EVID. 508(c). Boyd argues the exception set forth in Rule 508(c)(2) applies. *See id.* R. 508(c)(2). That exception states the privilege does not apply "if the [trial] court finds a reasonable probability exists that the informer can give testimony necessary to a fair determination of guilt or innocence." *Id.* R. 508(c)(2)(A).

In seeking disclosure of an informant's identity under that exception, the defendant bears the threshold burden of establishing a reasonable probability that the informant's testimony would be necessary to a fair determination of guilt or innocence. *Bodin v. State*, 807 S.W.2d 313, 318 (Tex. Crim. App. 1991); *Blake*, 125 S.W.3d at 728; *Portillo*, 117 S.W.3d at 928. To meet this burden, the defendant must show the informant's testimony would significantly aid his defense; mere conjecture or speculation is insufficient, as is merely filing a motion for disclosure. *Bodin*,

807 S.W.2d at 318 (holding defendant is required to make plausible showing of how informant's information may be important). If the defendant meets this initial burden, the State is given the opportunity to show, *in camera*, facts relevant to whether the informant can supply the alleged necessary testimony. *See* TEX. R. EVID. 508(c)(2)(C); *see also Long v. State*, 137 S.W.3d 726, 732 (Tex. App—Waco 2004, pet. ref'd).

*Application*

In support of his Rule 508 motion, Boyd argued to the trial court that it was his belief that there would be "no other evidence to show the affirmative link besides the testimony of the confidential informant." Boyd argued then — and now on appeal — that because this was the only evidence affirmatively linking him to the narcotics, a reasonable probability existed that the informant could provide testimony necessary to a fair determination of guilty or innocence, entitling him to disclosure of the informant's identity. *See Bodin*, 807 S.W.2d at 318; *Blake*, 125 S.W.3d at 728; *Portillo*, 117 S.W.3d at 928.

First, at the time he made this argument in the trial court, his contentions were nothing more than mere conjecture or speculation. *See Bodin*, 807 S.W.2d at 318. Boyd had no definitive proof that the only evidence the State had linking him to the narcotics was the information provided by the informant to Deputy Uriegas. Pursuant to *Bodin*, conjecture or speculation of the sort relied upon by Boyd is insufficient. *See id.* However, even if we consider his claim a plausible showing of how the informant's information was important to the defense, it turned out his belief was incorrect — as discussed in our analysis of Boyd's first issue, the State produced evidence other than the informant's statements that affirmatively linked Boyd to the narcotics.

Deputies surveilled room #230, noting moderate traffic coming in and out of room #230 over a twenty-four hour period. When the search warrant was executed, Boyd was found in the room, in his underwear. There was evidence suggesting Boyd had been living in the room for an

extended period of time, allowing the jury to infer Boyd had control over the room where the narcotics were found. The crack cocaine was hidden in the ceiling above the bathroom vanity. Deputy Uriegas found a loaded firearm with the cocaine. He also found an unusual item that would allow a person to retrieve the narcotics from the place where they were hidden. Deputy Uriegas described how powdered cocaine is turned into crack cocaine by use of a glass measuring cup. Sergeant Hancock testified that he when he surveilled the Travel Inn, he saw Boyd leave his room and place an item in the trunk of his vehicle. During the search, the sergeant found a Pyrex measuring cup in Boyd's trunk. He noted that the "cookie" of crack cocaine found in room #230 fit into the bottom of the Pyrex cup. Moreover, the "cookie" of crack cocaine had defined edges, as if it had been cut. The evidence showed deputies also found razor blades during the search.

Accordingly, the informant's statement that he had witnessed Boyd selling crack cocaine from room #230 was not the only evidence linking Boyd to the crack cocaine. There were various links connecting him to the contraband. We hold Boyd failed to make a plausible showing of how the informant's information may have been important. Thus, we hold the trial court did not err in denying Boyd's motion to disclose the informant's identity. *See* TEX. R. EVID. 508; *Taylor*, 604 S.W.2d at 179.

Moreover, even if the trial court erred and should have required disclosure of the informant's identity, we hold such error did not affect Boyd's substantial rights. *See* TEX. R. APP. P. 44.2(b). Given the evidence connecting Boyd to the crack cocaine, we do not find the failure to require disclosure of the informant's identity had a substantial or injurious affect or influence on the jury's verdict. *See Perez*, 414 S.W.3d at 789. Boyd's second issue is overruled.

### *Disclosure of Gun Owner — Brady v. Maryland*

Finally, Boyd contends the State committed a *Brady* violation by failing to provide him with the identity of the owner of the firearm found in room #230 and when said owner stayed in

room #230. *See Brady v. Maryland*, 373 U.S. 83 (1963). According to Boyd, this information was exculpatory, suggesting that someone other than Boyd owned the gun, and by inference, the drugs. Thus, Boyd contends the State should have provided him with the name of the gun owner and the dates of his occupancy of room #230.

*Preservation*

Before we can address the substance of Boyd's contention, we must determine whether he has preserved his complaint for our review. When *Brady* material is divulged during trial, a defendant's failure either to (1) object to the admission of the evidence based on a *Brady* violation, or (2) request a continuance, waives the error "or at least indicates that the delay in receiving the evidence was not truly prejudicial." *Perez*, 414 S.W.3d 790 (quoting *Apolinar v. State*, 106 S.W.3d 407, 421 (Tex. App.—Houston [1st Dist.] 2003), *aff'd on other grounds*, 155 S.W.3d 184 (Tex. Crim. App. 2005)); *see Smith v. State*, 314 S.W.3d 576, 586 (Tex. App.—Texarkana 2010, no pet.) (holding *Brady* challenge not preserved because trial court never ruled on complaint); *Young v. State*, 183 S.W.3d 699, 706 (Tex. App.—Tyler 2005, pet. ref'd) ("The failure to request [a continuance] waives any *Brady* violation, as well as any violation of a discovery order."). This court specifically held in *Jones v. State*, that a defendant must request a continuance and present his *Brady* complaint in motion for new trial to preserve the complaint for appellate review; 234 S.W.3d 151, 158 (Tex. App.—San Antonio 2007, no pet.); *see Keeter v. State*, 175 S.W.3d 756, 759–61 (Tex. Crim. App. 2005) (holding failure to raise alleged *Brady* error as separate complaint during hearing on motion for new trial waived error), *cert. denied*, 546 U.S. 852 (2005); *Williams v. State*, 995 S.W.2d 754, 761–62 (Tex. App.—San Antonio 1999, no pet.) (holding failure to request continuance based on alleged *Brady* violation waives error).

During his cross-examination of Deputy Uriegas, Boyd solicited information about ownership of the gun and whether authorities had determined whether the owner has ever occupied

room #230.  Thus, the alleged *Brady* material was divulged during trial.  When the deputy advised that he had run the serial number of the gun, but could not remember the name of the owner or if and when he might have occupied room #230, Boyd neither raised a *Brady* objection nor requested a continuance in an attempt to discover the allegedly exculpatory information.  Moreover, Boyd did not file a motion for new trial raising the alleged *Brady* violation.  Accordingly, we hold Boyd has failed to preserve his alleged *Brady* violation for our review.  *See, e.g., Keeter*, 175 S.W.3d at 759–61; *Jones*, 234 S.W.3d at 158.  However, even if he had preserved the complaint, we find it is without merit.

*Applicable Law*

A defendant's due process rights under the Fourteenth Amendment are violated when a prosecutor, whether in good or bad faith, fails to disclose evidence favorable to the defense that creates a probability sufficient to undermine confidence in the outcome of the proceeding.  *Brady*, 373 U.S. at 86.  The purpose of the *Brady* rule is to avoid an unfair trial.  *Id.* at 86–88.  To establish a due process violation based on *Brady*, the defendant must show: (1) the evidence was suppressed; (2) the suppressed evidence was favorable to the defendant; and (3) the suppressed evidence was material to either guilt or punishment.  *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011); *Morris v. State*, 530 S.W.3d 286, 290 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).  With regard to suppression of the exculpatory evidence, *Brady* does not apply, i.e., the State does not have a duty to disclose exculpatory evidence, "if the defendant … could have accessed it from other sources."  *Pena*, 353 S.W.3d at 810.

*Application*

During trial, Boyd's counsel asked Deputy Uriegas on cross-examination whether he "[ran] the serial number for the gun[]" found in room #230 at the time of Boyd's arrest.  Boyd contends that although the deputy could not remember the name of the person who owned the gun, the

deputy testified he was able to determine the gun owner had previously stayed in room #230. First, we do not interpret the testimony as Boyd does. The following is the testimony of Deputy Uriegas's recollection regarding the gun found in the ceiling of room #230:

```
Q.   Did you run the serial number for the gun?
A.   Yes.
Q.   Did it come back to you?
A.   I don't remember.
Q.   You don't know?
A.   Yes.
Q.   Do you know if that person that owned the gun ever
stayed in that room?
A.   Yeah, I think we determined that, yeah.  I don't
remember, though.
Q.   You don't know?
A.   No.
Q.   You don't know?
A.   No, I don't.
```

When considered in its entirety, the colloquy between Boyd's counsel and the deputy merely shows the deputy ran the serial number for the gun, but he could not remember who owned the gun or whether the owner had stayed in room #230. In any event, the information Boyd claims is exculpatory — the name of the gun owner and when he stayed in room #230 — was available to Boyd prior to trial.

Boyd knew a gun was found when he was arrested. The indictment included a deadly weapon allegation, stating "the defendant did use and exhibit a deadly weapon, to wit: A FIREARM, during the commission of the offense." Additionally, on March 24, 2017, prior to trial, Boyd's counsel was provided with a witness list — the list included the names and addresses of six members of the BCSO, including Deputy Uriegas. There is nothing in the record to suggest Boyd's attorney was precluded from speaking to the deputies about the gun and its ownership prior

to trial. He could have inquired about the serial number and the identity of the gun's owner. Once he had that information, he could have contacted the Travel Inn to determine if and when that person stayed in room #230. Thus, Boyd fails the first prong of the test set out in *Pena*. *See* 353 S.W.3d at 809. The allegedly exculpatory evidence was not suppressed by the State or its agents. *See Jones*, 234 S.W.3d at 158. Information on the gun was only unavailable to Boyd because his counsel failed to procure it prior to trial or ask for a continuance to allow counsel to procure it once Deputy Uriegas testified. *See id.* Because the information was available to Boyd, there was no *Brady* violation. *See id.* We overrule his third issue.

## CONCLUSION

Based on the foregoing analysis, we hold Boyd has either failed to preserve his complaints for our review or they are without merit. Accordingly, we overrule his issues and affirm the trial court's judgment.

Marialyn Barnard, Justice

Do Not Publish