

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-23-00468-CR

Ricky Lee **REYES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 229th Judicial District Court, Jim Hogg County, Texas
Trial Court No. 21-CRJ-76
Honorable Baldemar Garza, Judge Presiding

Opinion by: Adrian A. Spears II, Justice

Sitting: Rebeca C. Martinez, Chief Justice
Adrian A. Spears II, Justice
H. Todd McCray, Justice

Delivered and Filed: March 26, 2025

AFFIRMED

Ricky Lee Reyes was charged with two counts of sexual assault. The State filed its Notice of Final Conviction for Punishment Enhancement pursuant to section 12.42 of the Texas Penal Code, stating that Reyes had previously been convicted twice of aggravated assault with a deadly weapon. Representing himself at trial with standby counsel present, Reyes was found guilty of both counts of sexual assault and was sentenced to seventy years of imprisonment for each count to run concurrently. He brings five issues on appeal: (1) whether the trial court erred in denying

his requested jury instruction as to mistake of fact; (2) whether he was given inadequate admonitions regarding pro se representation; (3) whether the State failed to give him medical records pertaining to the complainant in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (4) whether he was denied access to the court; and (5) whether the trial court's errors were harmful because of their cumulative effect. We affirm.

## BACKGROUND

Reyes was charged with two counts of sexually assaulting K.G. At trial, K.G. testified she was in a relationship with Reyes, and she and her three small children were living with him. According to K.G., a few months into the relationship, she began to notice that Reyes drank every day and would not stop. She testified, "He was like a completely different person." Reyes became controlling and possessive, even becoming jealous of her relationship with her small children. He accused K.G. of having an affair with the father of her children. K.G. testified she "was very faithful to" Reyes, but "[h]e just never believed [her]." According to K.G., on the night in question at about 2:00 a.m., she was upstairs, lying in bed with her two-year-old son. She went downstairs and saw Reyes "doing crack and he was drinking alcohol." She testified Reyes was "burning [crack] on the spoon." K.G. testified this was the second time she had seen Reyes burning crack on a spoon. K.G. testified she was upset because she had asked him not to do "drugs and alcohol anymore" and because her son was upstairs. K.G. said to Reyes, "Really?" "I thought you said you were done with everything. I'm tired of this; I don't want to do it anymore. I want to leave." According to K.G., she turned around and went back upstairs to get her things and her son. Reyes followed her upstairs, asking her if she wanted to leave. Because she believed Reyes was going to allow her to leave the apartment, she picked up her son. Reyes "got [her] by the neck and shoved [her] to the bed." He said that she was not going anywhere. K.G. testified she was "terrified,"

especially because her son was there. K.G. testified that her son saw everything that happened next. Reyes "pushed [her] onto the bed" and "threatened her" by saying that if she went anywhere, he would kill her father, her brother, and the father of her children. K.G. testified that when she "tried to get back up again," Reyes "slapped [her] and grabbed [her] by the neck and shoved [her] to the restroom door and started banging [her] head on the door panel." K.G. testified that she had "never experienced anything like that" and "it did hurt." Reyes "just kept hitting [her] in the back of [her] head." K.G. testified,

> I was terrified. And I slapped him back. I slapped him for it. Of course, he was banging my head against the door, so I slapped him. He didn't like that I slapped him, so he slapped me and grabbed me by my hair, slapped me around a few more times, I slapped him again. I even tried to grab him in the private part, it didn't do nothing [sic] to him. Uh, when I tried to hit him again, he got hold of my hands, our fingers locked together, he twisted my hand, my fingers, squeezing them real tight. Felt like he was going to break my fingers. I even got scratches on my hands and I have pictures of that. Uh, and again, eventually he stopped and threatened again, "You're not leaving because I'll kill your dad." . . . . Honestly, it was scary. Really scary at that point. I know sometimes he had threatened the relationship [sic] that he would hurt my dad, my brother, or [the father of my children], but this time, it felt scarier because of what he had just done to me. So, I started taking it more seriously when he said that.

K.G. testified Reyes "eventually stopped." K.G.'s son "was sitting on the bed just watching, quietly. No crying or nothing, just watching." K.G. testified that seeing her son like that "broke [her] heart" but Reyes "didn't care." Reyes then went back downstairs. K.G. "got [her] son and laid in bed with him but [she] put him in his own bed." According to K.G., Reyes would become upset if he saw her in bed with her small children, so she just stayed with her son until he fell asleep. Then, she went to her own bed. K.G. testified she believed Reyes would hurt her family because of his history of violence, explaining that Reyes had been to prison—"[h]e brags about it." K.G. testified Reyes had been convicted for aggravated assault because he had hit someone "with a mallet or a crowbar."

When it was daylight, Reyes woke her up, demanding that she come downstairs. K.G. testified that "he was still very much drunk." According to K.G., she said that she did not want to go downstairs, but Reyes threatened that if she did not come downstairs, he was going to grab her by the hair and drag her down. K.G. went downstairs and noticed the living room floor "was full of ripped up pictures." The photos of her children in her photo album, including the ultrasounds from her pregnancies, had been "ripped up." She asked Reyes what he had done and started to pick up the pictures, when Reyes said, "No, get up." K.G. testified to what happened next:

> He said, uh, "Are you F, Fing [the father of K.G.'s children]?" And once I said no, he punched me in the face. And I tried to punch him back and he didn't let that happen. When I tried to punch him back, he punched me again. He grabbed me by the neck, threw me to the floor, the concrete floor because that's what it was. And from there, he just stood over me and started punching me all over my head and I was covering my face. Not a word was being said to me the whole time, just punching me. Just me screaming for him to please stop and to get off of me and he was hurting me, and he didn't listen to me. He was—in another world. And honestly, all I remember, I could smell of his breath, smelling alcohol and I can never forget, forget the look in his eyes. I'll never forget it. . . . It wasn't him anymore. To me, it was—the look in his eyes, he was just pure evil. That's all that he was to me.

K.G. testified that the "whole time that he was hitting [her], [she] was just, of course, . . . afraid and [she] was honestly hoping that somebody would hear [her] screaming and kick the door open and come and save [her]." K.G. testified, "I honestly thought he was going to kill me." When asked if he stopped when she started pleading with him to stop, K.G. replied, "No, he didn't stop there. After a while, he stopped on his own." K.G. was on the ground and Reyes got up and "kicked [her] on the side of [her] head." He told her "to shut the F up." Then, "he went to the couch and he covered the door with it." When K.G. "saw him covering the door, it scared [her] more because [she] didn't know what he was gonna [sic] do next." Reyes came back to K.G., and she began screaming again. "He covered [her] mouth and [her] nose, squeezing [her] face tightly, and his other hand around [her] neck, squeezing [her] neck." He told her "to shut the F up or it was going

to get worse." The baby then started crying, and Reyes told her to go upstairs. She checked on the baby, covering him with a blanket. She then went back to her bed.

Reyes then "crawled into bed with [her]." K.G. thought he was going to apologize, "but he grabbed [her] and turned [her] around to face him and that's when[] he grabbed [her] hair and pushed [her] down to give him oral and [she] didn't want to and was resisting, pulling [her] head away." He said, "You don't feel like doing it or what?" K.G. said, "No, I don't feel like it." K.G. said she "told him [her] jaw was hurting. From the hits." He replied, "Well, too bad. You know you like it." K.G. testified Reyes pushed her head back down and she "did what he wanted me to do." K.G. testified Reyes began "getting mad at" her and "turned [her] over onto [her] knees and he penetrated [her] vaginally and he was pulling [her] hair and pushing on [her] back real hard and he was being real aggressive with [her]." After he finished, K.G. testified that her back was facing him "and he had the nerve to ask [her], 'Uh, so I raped you or what?'" K.G. testified that when Reyes "said that, [she] cried." "He was laughing when he" said that. K.G. did not answer him, and Reyes said, "That's effed up." He then went to sleep. K.G. testified it took her a while to fall asleep because she was afraid. She testified she had not consented to sexual relations with him. According to K.G., "I didn't want to do anything sexual with him when he was just—beating me. He almost killed me."

K.G.'s mother testified that K.G. had abrasions to her ear, marks on her neck, and bruises and bumps on her head. K.G.'s brother and Deputy Godinez, the officer who interviewed K.G., also testified about K.G.'s injuries.

In contrast, Reyes denied assaulting K.G. He testified that in August, K.G. was being argumentative with him and "cussing" at him, trying to "provoke [him] and instigating." According to Reyes, while K.G. was "cussing" at him, he told her, "Slap me." Reyes testified that

K.G. "slapped [him] once." Reyes said, "Harder." K.G. "slapped [him] again." Then, he asked if she felt better, and K.G. replied that she did not and continued yelling at him. Reyes replied, "What do you want from me?"

Reyes claimed that K.G. had called the police before, and because "she was going all frantic and stuff," he had to "hold her by the arm," telling her "to calm down." Reyes claimed that on that occasion, he "did not hit her," "did not punch her," and "did not strike her." Reyes testified that because K.G. said she needed to wash clothes at her mother's home, they went to her mother's home and then he was approached by police and arrested for assault family violence. Reyes spent three days in jail. Reyes testified that within a month, K.G. wanted to get back together and he agreed because he felt sorry for her.

On the day in question, Reyes testified that K.G. was being argumentative and yelling at him. He asked her, "What's wrong with you?" Then he said, "Do you know what? I am going to give you some time." Reyes then testified:

> I went downstairs. And this is on a Monday. And, uh, I went downstairs, and, uh, when I went downstairs, I was on the phone for a little bit, I got Facebook whatever and this and this and I was like, and I was thinking, you know, maybe she'll come down or what's going on or whatever, I just leave her alone, you know. Uh, so I— 30, 30, 35 minutes later, I go up the stairs. Uh, I go upstairs 35—30, 35 minutes, more or less, give or take. I go upstairs, uh, and she's already on the bed, you know. Uh, [K.G.'s son is] on his bed and, uh, pos, yah, it was around, I think it was around 7:30—7:30 or 8:00 [a.m.], around there. So I, I go in to take a shower, come out, I get into my pajamas and I go lay down. And, uh, that's whenever she, uh, she, uh, she starts performing oral sex on me. Uh, she performed oral sex on me and, uh, for a little while for like, maybe like ten minutes, she's performing oral sex. And then, uh, we, uh, doggy style, you know, poom, doggy style, we have sex there like that and then, uh, that was it. She never said anything; she never said nothing [sic]; it was all consensual to me. I mean, if anything, it would have been, it was, it would be my mistake if, you know, she would have said, you know, she would have said, "No," I means, I would understand, you know.

Reyes adamantly denied assaulting K.G. and forcing her to have sexual relations:

I did not rape [K.G.]; I did not pull her hair; I did not do any of that. Nothing. Like, punch, kick, slap, I did not do nothing [sic] of that nature, at all.

Reyes further testified that the next day he saw a bruise on K.G. and asked her about it. According to Reyes, K.G. said that her son "hit her with a toy."

On cross-examination, Reyes admitted that he had been twice convicted for aggravated assault with a deadly weapon: once for hitting someone on the head with a mallet, and the other time for hitting someone on the head with a crowbar. He admitted that he pled guilty to both offenses, but claimed he was not guilty of either offense. He testified that with regard to the first offense, he acted in self-defense and that with regard to the second offense, he acted under duress. Reyes blamed his former attorneys for his convictions, stating that he "kn[ew] the law now." Reyes admitted that he "use[d] meth one time," "snorted cocaine on the weekends sometimes," and had tested positive for methamphetamine while he was in a relationship with K.G. He also admitted that he had been arrested for family violence with respect to the mother of his children and had hit her, but claimed he had done so in self-defense. When asked about whether he physically assaulted and then sexually assaulted K.G., Reyes testified,

> Q: Let's go back to [K.G.'s] testimony about the physical assault followed by the sexual assault. Okay? Do you remember, do you remember that part of her testimony?
> A: Uh, yes.
> Q: Okay. Do you remember her testifying that you physically assaulted her upstairs? Later you physically assaulted her downstairs when you tore up the pictures. Do you remember that?
> A: When she—when she said that?
> Q: Yes. Do you remember her saying that?
> A: When she made those allegations against me?
> Q: Yes.
> A: Yes, I heard that.
> Q: Okay. And then she testified that you physically forced yourself on her sexually, upstairs, that morning. Do you remember that?
> A: I heard those allegations. Yes, I did.
> Q: Right. Okay. Now, you are telling this jury that you didn't lay a hand on her.
> A: No, I did not.

Q: Okay. How is it, if you were with her, all of that time, how is it that she ended
   up with all of those injuries on her face that were noticed by various people?
A: I have no idea. She—she—she only had one bruise on Friday and that's it. That
   like, I—I—like I told, uh, told the jury, that's it. All these other injuries? I have
   no idea.

When asked specifically about the testimony from K.G.'s mother, K.G.'s brother, and Deputy

Godinez about K.G.'s injuries, Reyes testified that "they are all lying."

With regard to the first count, the jury charge instructed the jury the following:

COUNT 1

You must determine whether the State has proved, beyond a reasonable doubt, two
elements. The elements are that-

1.  The defendant, in Jim Hogg County, Texas, on or about the 16th day of August,
    2019, intentionally or knowingly caused the penetration of the sexual organ of
    [K.G.] by the defendant's sexual organ; and
2.  This penetration was *without the consent of [K.G.]* because the defendant
    either—
    a. *Used physical force, violence, coercion, and by that physical force,
       violence, or coercion compelled* [K.G.] to submit or participate; or
    b. *Threatened to use physical force or violence against* [K.G.], and [K.G.]
       believed that the defendant had the present ability to execute the threat,
       and by this threat the defendant compelled [K.G.] to submit or
       participate.

You must all agree on elements 1 and 2 listed above, but you do not have to agree
on the form of absence of consent listed in elements 2.a. and 2.b. above.

If you all agree the State has failed to prove beyond a reasonable doubt, one or both
of elements 1 and 2 listed above, you must find the defendant "not guilty."

If you all agree the State has proved, beyond a reasonable doubt, both of the two
elements listed above, you must find the defendant "guilty."

(emphasis added). As to the second count, the jury charge instructed the jury the same as the first

count, except that it included Count II's allegations that Reyes "intentionally or knowingly caused

the penetration of the mouth of [K.G.] by the defendant's sexual organ." Thus, both counts

instructed the jury that it could determine "penetration was without the consent of [K.G.]" because

Reyes either "[u]sed physical force, violence, coercion, and by the physical force violence, or coercion compelled [K.G.] to submit or participate" or "[t]hreatened to use physical force or violence against [K.G.], and [K.G.] believed that the defendant had the present ability to execute the threat, and by this threat the defendant compelled [K.G.] to submit or participate."

The jury found Reyes guilty of both counts of sexual assault and sentenced him to seventy years of imprisonment. Reyes appealed.

### MISTAKE OF FACT

Reyes argues the trial court abused its discretion in denying his requested instruction on mistake of fact. "It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." TEX. PENAL CODE § 8.02(a). The mistake of fact defense applies when the defendant's mistaken belief, if accepted as true, negates the culpable mental state for the crime charged. *Granger v. State*, 3 S.W.3d 36, 41 (Tex. Crim. App. 1999). The defense "applies only with respect to elements that require proof of a culpable mental state." *Celis v. State*, 416 S.W.3d 419, 430 (Tex. Crim. App. 2013). If the evidence raises the defense, "whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the evidence," the trial court should provide the instruction. *Granger*, 3 S.W.3d at 38. Here, Reyes argues that he was entitled to a mistake of fact instruction because he testified "that he believed the sex acts alleged to have been assaultive were consensual."

Both counts instructed the jury that it could determine "penetration was without the consent of [K.G.]" because Reyes either "[u]sed physical force, violence, coercion, and by the physical force, violence, or coercion compelled [K.G.] to submit or participate" or "[t]hreatened to use physical force or violence against [K.G.], and [K.G.] believed that the defendant had the present

ability to execute the threat, and by this threat the defendant compelled [K.G.] to submit or participate." Thus, if the jury believed K.G.'s version of the events beyond a reasonable doubt that she was sexually assaulted through force and threats, they were instructed to find Reyes guilty. When, as here, "there is sufficient evidence showing sexual assault by force and threats, the issue of consent as it relates to the victim is removed, and a defendant is not entitled to a charge on the defense of mistake of fact." *Bertrand v. State*, 22 S.W.3d 660, 661-62 (Tex. App.—Amarillo 2000, pet. ref'd) (citing *Drakes v. State*, 505 S.W.2d 892, 894 (Tex. Crim. App. 1974)). Thus, Reyes was not entitled to an instruction on mistake of fact.

### ADMONITIONS REGARDING SELF REPRESENTATION

Reyes argues the trial court did not adequately admonish him "regarding his decision to represent himself such that the decision would be made competently and intelligently" by making him "aware of the dangers and disadvantages of self-representation." "[E]very criminal defendant has a constitutional right to the assistance of counsel and the constitutional right to self-representation." *Osorio-Lopez v. State*, 663 S.W.3d 750, 756 (Tex. Crim. App. 2022); *see also* U.S. CONST. amend VI; TEX. CONST. art. I, § 10. "The right to self-representation and the assistance of counsel are separate rights depicted on the opposite sides of the same Sixth Amendment coin." *Osorio-Lopez*, 663 S.W.3d at 756 (citation omitted). "To choose one obviously means to forego the other." *Id*. (citation omitted).

"While the right to counsel is in force until waived, the right of self-representation does not attach until asserted." *Id*. (citation omitted). "Assertion of the right to self-representation must be clear and unequivocal." *Id*. "To choose self-representation competently and intelligently, the defendant should be made aware of the dangers and disadvantages of self-representation so that the record will establish that the defendant 'knows what he is doing and his choice is made with

his eyes open.'" *Walker v. State*, 962 S.W.2d 124, 126 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) (quoting *Faretta v. California*, 422 U.S. 806, 835 (1975)).

"Whether a waiver of counsel was effective depends on the totality of the circumstances, which includes considering the background, experience, and conduct of the accused." *Osorio-Lopez*, 663 S.W.3d at 756 (citation omitted). In admonishing the defendant, "a trial court 'need follow no formulaic questioning or particular script to assure itself that an accused who has asserted his right to self-representation does so with eyes open.'" *Id*. (quoting *Burgess v. State*, 816 S.W.2d 424, 428 (Tex. Crim. App. 1991)). "And a defendant need not have the skill and experience of a lawyer 'to competently and intelligently choose self-representation.'" *Id*. (quoting *Faretta*, 422 U.S. at 835). "The focus is on whether the defendant is competent to choose to proceed pro se, not whether he is equipped to represent himself at trial." *Id*. (citing *Godinez v. Moran*, 509 U.S. 389, 400-01 (1993)).[1]

The record reflects that Reyes had been twice convicted of felony offenses and had been sentenced to serve years in prison. The record further reflects that Reyes's decision to waive his right to counsel and invoke his right to self-representation stemmed from his experiences with his former attorneys. At a pretrial hearing on November 29, 2021, Reyes was adamant that he intended to represent himself. The trial court ensured that Reyes understood he had a right to hire his own attorney and that one would be appointed to represent him if he could not afford one. Reyes reiterated that he had prepared his defense and would not need an attorney. Over several pretrial hearings, the trial court repeatedly asked Reyes if he wanted appointed counsel, but Reyes repeatedly stated that he intended to invoke his right to represent himself.

---

[1]The Texas Code of Criminal Procedure provides that the waiver of right to counsel should be made in writing. *See* TEX. CODE CRIM. PROC. art. 1.051(g). However, the Texas Court of Criminal Appeals has held that article 1.051(g) is not mandatory and the constitutional right to counsel can be waived orally. *See Burgess*, 816 S.W.2d at 430-31.

Before trial began, the trial court again asked Reyes whether he wanted an attorney. Reyes again confirmed he did not want one. The trial court warned Reyes that "these things tend to be very complicated" and while the trial court could "tell that [Reyes was] a smart person," "even for smart people, if they are not trained in the law, it can be complicated." Reyes replied that he has "had three years to study, Your Honor." The trial court noted on the record that the only reason Reyes did not have appointed counsel was because he had previously informed the trial court that he did not want an attorney. The trial court then stated it was going to appoint the public defender's office to be present so that Reyes could ask questions:

> But what I am going to do is I am going to appoint the public defender's office—I know Mr. Burnett and Ms. Cantu are here, very competent lawyers—for them to be present in case you have a question. It's up to you whether you want to use them or not in that regard uh, but, uh, I just want to, for the record, ask you one more time because, uh, the charge against you is serious. . . . The possible consequences are serious. . . . And you are entitled to have the best defense possible. And I'll ask you one more time because if, uh, the public defender's office is here, they'll be here in case you have a question. But it's not like they are your lawyers . . . .

Reyes replied, "What you are trying to say is standby counsel, in other words to, you know, lead me and guide me if I have any questions during the trial?" The trial court replied, "Right." Thus, the record reflects that Reyes was already familiar with the concept of standby counsel when mentioned by the trial court.

The trial court then offered yet again to appoint "Mr. Burnett or Ms. Cantu or somebody else from the public defender's officer to represent [Reyes]." Reyes rejected the offer:

> Like I told you before, Your Honor, I already had too many with [sic] lawyers. I already tried three or four lawyers already and—I mean, you know, I even had an attorney tell me to shut the F up just when I asked him [whether he could] read me the statement, he just went off on me, you know, and I already had that and with, uh, the TRLA I had [another attorney] during the county court, you know. He asked incriminating question when he could have just—it was just a bond reduction and, you know, the line of questioning was, you know.

Reyes stated that he did not mind standby counsel being appointed but he "would not take an attorney to represent and speak on [his] behalf." Mr. Burnett then stated on the record that he and the public defender's office would act as standby counsel for Reyes. The trial court again asked Reyes whether he was sure he wanted to represent himself. Reyes again replied, "Yes, sir."

The record reflects that at the beginning of the second day of trial, Reyes, standby counsel Burnett, and the State had a discussion about a juror being sick and the need to replace that juror with an alternate juror. The trial court then asked if there was anything to be discussed before the jury came back into the courtroom. Reyes stated,

> Well, Your Honor, uh, I was just, uh, telling Mr. Burnett, uh, I didn't trust him by my side. I didn't trust him because earlier, I told him that at least there's a nurse present as a juror and, uh, all of a sudden, she fell ill. She fell sick and we already had a, you know, I don't trust the TRLA, period. I just had them standby counsel so you can be comfortable, at least having that there was side counsel, side standby counsel and I am removing him from being standby counsel. I don't want him by my side.

The trial court responded, "Well, let's, uh, first of all, it's not just about me feeling comfortable, you are facing a very serious charge." The trial court noted that Reyes had a right to represent himself and further explained that the trial court clerk received a phone call from the juror at 7:00 a.m. stating that she was unable to come to court because she was "very sick." The trial court stated, "I have no doubt in my mind that . . . Mr. Burnett would not reach out to talk to a juror." The trial court further stated,

> I have seen him, the way he practices, uh, not only is he a competent lawyer, I think he's an honorable lawyer and that's not to say that all lawyers are like that but I know he is one. And I have no doubt in my mind that I don't think he would do anything like that. That having been said, uh, Mr. Reyes, ultimately, it's your case. Now, uh, when you say that you don't trust, uh, TRLA, okay. I have not heard any reason why you wouldn't or would, but that having been said, that's up to you. If you insist and the last thing I want is for, uh, you to feel uncomfortable or feel that I am forcing you to have Mr. Burnett or Ms. Benavides, if you don't want them here, you tell me. That's up to you.

Reyes responded that he did not want either standby counsel at trial, reiterating that he did not trust any attorney. He complained that there was "corruption involved in [his] case," but that he was "going to fight for [his] life today." He agreed with the trial court that he was facing "serious charges." The trial court then asked what the standby counsels had done to betray his trust. Reyes did not respond to the question, instead stating that he did not trust his former attorney, who had been a former prosecutor. The trial court emphasized that they were not discussing his former attorney. The trial court stated,

> What you said was that Ms. Benavides had not done anything wrong and you intimated or at least I'm interpreting that you are insinuating or maybe you believe that Mr. Burnett did something wrong or improper, and if it is [so], I want to know because it affects the case and it affects the way I see things. So, if you know something that Mr. Burnett did improper and that's why you don't want him, tell me why.

Reyes responded, "I don't trust nobody. I don't trust nobody, sir." Reyes then admitted that Mr. Burnett had not told him anything wrong. The prosecutor complained that Reyes was "building in reversible error" and suggested the trial court have the standby counsels sit behind Reyes so that Reyes could confer with them at any point in trial if he so wished. The trial court agreed with this suggestion, noting that Reyes had made it clear he did not trust law enforcement or any lawyer. The trial court noted that the two standby counsels were professionals who knew the seriousness of the matter and was thus ordering them to stay and provide assistance if requested by Reyes. The trial court noted that Reyes had been talking to standby counsel during the first day of trial and asking questions, which was exactly why the trial court had appointed them. Thus, the record reflects that standby counsel was present to aid Reyes, if he so desired, during trial and that Reyes used the assistance of standby counsel at certain portions of the trial.

Later that day, when Reyes was attempting to admit an exhibit in evidence, the trial court explained to Reyes that the State had objected to the exhibit not being properly authenticated.

Reyes asked what the trial court meant, but the trial court explained that it could not give Reyes legal advice. Reyes then accused the trial court of "putting pressure on [him] to get an attorney." The trial court replied that it was not doing that. The trial court explained to Reyes that "we need to follow the rules" and reminded Reyes that he was the one who wanted to represent himself. When Reyes appeared to still be confused about the objection, standby counsel stated, "Your Honor, we are available. It's up to the defendant." Reyes stated, "What I am asking him, what is the predicate? And I am asking him, you know, I am asking for help." The trial court replied that Reyes could go ask standby counsel for assistance and the record indicates an "off-the-record" discussion between Reyes and both standby counsel present. Outside the presence of the jury, the trial court again explained the difficulties faced by self-representation:

> I am not trying to pressure you to have [a] lawyer, you are the one [who] wants a lawyer. Now you want to talk to [standby counsel]. And that's okay. That's what I think is the best thing for you, but I am not trying to pressure you. So, I am warning you. Don't say that again in the front of the jury because I am not trying to pressure you to have a lawyer. They can sit up there and not do anything as far as I'm concerned, it's your request and, and, and [sic] I understand, these are complicated things for anybody. I know you are an intelligent person, I can tell, but even lawyers don't understand some of these rules sometimes. So, the only thing I am going to say is I do want to give you a fair trial, and I want you to get whatever you want to get in there but you are going to have to follow the rules and they are complicated, I have to say that, but that's why [standby counsel] are here.

As described above, the record reflects that Reyes utilized standby counsel during trial. "The term 'standby counsel' usually describes when, in response to a defendant's request for self-representation, the trial court instead allows" an attorney to "be available to advise the defendant and participate in the case, or not, as requested by the defendant." *Walker v. State*, 962 S.W.2d 124, 126 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd). "In such a case, if the defendant thereafter invokes the participation of standby counsel, the representation becomes hybrid, which has been described as 'partially pro se and partially by counsel.'" *Id*. (quoting *Landers v. State*,

550 S.W.2d 272, 280 (Tex. Crim. App. 1977)). The court of criminal appeals has explained that *Faretta* self-representation admonishments are not required in a case of hybrid representation. *See Maddox v. State*, 613 S.W.2d 275, 286 (Tex. Crim. App. 1981) (op. on reh'g) (explaining that because record reflected standby counsel gave defendant advice when he requested it, the "defendant was allowed to engage in a form of hybrid representation" and no admonishments were required); *Phillips v. State*, 604 S.W.2d 904, 908 (Tex. Crim. App. 1979) (holding that because "appellant partially represented himself" but "was also fully represented by counsel" and thus had "hybrid representation," the trial court was not required to give *Faretta* admonishments). Therefore, because standby counsel was appointed and utilized by Reyes in this case, the trial court was not required to give *Faretta* self-representation admonishments. *See Maddox*, 613 S.W.2d at 286 (holding defendant who engaged with standby counsel and thus elected hybrid representation was not entitled to the admonishments concerning the dangers of self-representation because standby counsel was available to the defendant and participated in the trial to some degree); *Dolph v. State*, 440 S.W.3d 898, 907-08 (Tex. App.—Texarkana 2013, pet. ref'd) (rejecting appellant's complaint that his waiver of the right to counsel was involuntary due to the trial court's failure to give the requested admonishments because appellant had hybrid representation by engaging with standby counsel during trial).[2]

---

[2]We note some appellate courts have extended this reasoning to when standby counsel is appointed but does not participate at trial. *See Walker*, 962 S.W.2d at 126-27 (holding that the trial court was not required to admonish the defendant where the defendant had access to standby counsel but did not use counsel's assistance); *Robertson v. State*, 934 S.W.2d 861, 865-66 (Tex. App.—Houston [14th Dist.] 1996, no pet.) (same).

-

## *BRADY* EVIDENCE

Reyes argues that the prosecution engaged in misconduct by failing to timely provide him discovery and thus violated article 39.14 of the Texas Code of Criminal Procedure and his constitutional due process rights as enunciated in *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Specifically, Reyes complains the prosecutors failed to timely give him certain medical records relating to K.G. Under *Brady*, the "State has an affirmative duty to disclose exculpatory evidence that is material either to guilt or punishment." *Perez v. State*, 414 S.W.3d 784, 789 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "The State's duty to reveal *Brady* material attaches when the information comes into its possession, not when it is requested." *Id*. However, the State "does not have such a duty if the defendant was actually aware of the exculpatory evidence or could have accessed it from other sources." *Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011).

"The purpose of this rule was to avoid an unfair trial of the accused: 'A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant.'" *Id*. at 809 (quoting *Brady*, 373 U.S. at 88). "The Supreme Court later explained that *Brady* essentially created a federal constitutional right to certain minimal discovery." *Id*. (citing *United States v. Bagley*, 473 U.S. 667 (1985), and *United States v. Agurs*, 427 U.S. 97 (1976)). To be reversible error, a defendant must show that (1) "the State failed to disclose evidence, regardless of the prosecution's good or bad faith;" (2) "the withheld evidence is favorable to him;" and (3) "the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different." *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). "A defendant's conviction should not be reversed simply because the *Brady* material was not disclosed as early as it might have and should have been." *Perez*, 414 S.W.3d at 790. "To show

prejudice, the defendant must show a reasonable probability that, had the evidence been disclosed to the defense earlier, the result of the proceeding would have been different." *Id*.

"When the Brady material is discovered during trial, the initial inquiry is whether the defendant was prejudiced by the delayed disclosure." *Perez*, 414 S.W.3d at 789-90. "The disclosure of *Brady* material during trial satisfies the requirements of due process '[i]f the defendant received the material in time to put it to effective use at trial.'" *Id*. at 790 (quoting *Palmer v. State*, 902 S.W.2d 561, 565 (Tex. App.—Houston [1st Dist.] 1995, no pet.)). "[W]hen previously withheld evidence is disclosed at trial, the defendant has an opportunity to request a continuance." *Young v. State*, 183 S.W.3d 699, 706 (Tex. App.—Tyler 2005, pet. ref'd); *see also Perez*, 414 S.W.3d at 790 (holding that when *Brady* material is disclosed at trial, "the defendant's failure either to object to the admission of the evidence on this basis or to request a continuance waives the error or at least indicates that the delay in receiving the evidence was not truly prejudicial." (citations omitted)). "The failure to request one waives any *Brady* violation, as well as any violation of a discovery order." *Young*, 183 S.W.3d at 706 (quoting *Williams v. State*, 995 S.W.2d 754, 762 (Tex. App.—San Antonio 1999, no pet.)).

"A complaint is timely if it is made 'as soon as the ground of objection becomes apparent.'" *Pena*, 353 S.W.3d at 807 (quoting *Hollins v. State*, 805 S.W.2d 475, 476 (Tex. Crim. App. 1991)). "Regarding its specificity, the objection must simply be clear enough to provide the judge and the opposing party an opportunity to address and, if necessary, correct the purported error." *Id*. "An objection is considered in the context in which the complaint was made and the parties' shared understanding of the complaint at that time." *Id*.

Here, it is undisputed that the prosecution gave the medical records at issue to Reyes at the beginning of trial and that when Reyes was given the medical records, he complained that the

prosecutor had not given him the "hospice report" fourteen days in advance, and that he was getting "State's evidence last minute" and "the State has like fourteen days, uh, to at least give me fourteen days to review this evidence." The trial court asked Reyes what he was talking about. Reyes replied, "I mean, the hospice report, I already have it. But the other hospice report, I didn't have so I would, I mean, the State would have to have like fourteen days to give me notice of—" In replying to Reyes, the prosecutor stated that if the prosecution "had filed it with a business record affidavit," the prosecution "underst[ood] [it] would have had to file it ahead of time Your Honor, but these records *were just provided to [the prosecutors] yesterday.*" (emphasis added). The prosecutor stated that it did not even know if it was going to attempt to introduce the medical records. Thus, it is clear from the record that the State understood Reyes's argument to be one *about admissibility* of the medical records. *See* TEX. R. APP. P. 33.1; *Pena*, 353 S.W.3d at 807. The trial court then replied to Reyes, "Well, uh, Mr. Reyes, at this point, they have given you records. Now, I don't know whether they are going to be used or not . . . ." Thus, the trial court also understood Reyes to be arguing about admissibility of the medical records. *See Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006) ("A general or imprecise objection may be sufficient to preserve error for appeal, but only if the legal basis for the objection is *obvious* to the court and to opposing counsel.") (emphasis in original). We conclude the record does not reflect that Reyes moved for a continuance during this exchange. *See Pena*, 353 S.W.3d at 807 (noting that while no "magic words" are required to preserve a complaint for appeal, an "objection is considered in the context in which the complaint was made and the parties' shared understanding of the complaint at that time").

Additionally, the record reflects that Reyes later attempted during trial to admit portions of the medical records and cross-examine certain witnesses with information contained in those

records. Thus, the record reflects that during the guilt/innocence phase of trial, Reyes believed information contained within the medical records at issue would aid his defense and attempted to use that information. Accordingly, the State's disclosure of the medical records at the beginning of trial satisfied the requirements of due process because the record reflects Reyes received the information in time to put it to use during trial. *See Perez*, 414 S.W.3d at 790. Further, because Reyes was aware of what he believed to be the exculpatory nature of the records during the guilt/innocence phase, he was required to move for a continuance to preserve his issue regarding the State's failure to timely provide him with discovery as required by article 39.14 and *Brady*. *See Young*, 183 S.W.3d at 706; *see also Pena*, 353 S.W.3d at 807, 809 (holding that defendant preserved error on his *Brady* complaint raised after "grounds for an objection . . . "bec[a]me apparent" and "the trial court and the State were both aware of the purported error"). In reviewing the guilt/innocence phase of trial, we can find no place where Reyes moved for a continuance based on the alleged discovery order and *Brady* violations. Accordingly, we conclude that Reyes did not move for a continuance as required to preserve his issue for appeal.[3] *See Perez*, 414 S.W.3d at 790; *Young*, 183 S.W.3d at 706.

---

[3]We note that Reyes did file a motion for new trial based on *Brady*. However, because Reyes was aware of his complaint at the time of trial, his motion for new trial did not preserve his *Brady* issue for appellate review. *See* TEX. R. APP. P. 33.1 (requiring a complaint to be made to trial court "by a timely request, objection or motion"); *Jones v. State*, 234 S.W.3d 151, 158 (Tex. App.—San Antonio 2007, no pet.) (holding that defendant must both request continuance and present *Brady* complaint in motion for new trial to preserve complaint for appellate review); *see also Pena*, 353 S.W.3d at 807 (holding *Brady* issue preserved in motion for new trial in case where "defense counsel discovered the audio portion of the videotape *after* the completion of final arguments and *after* the jury had retired to deliberations") (emphasis added); *Clarke v. State*, 270 S.W.3d 573, 580 (Tex. Crim. App. 2008) (holding *Brady* complaint was preserved pursuant to Rule 33.1 at motion for new trial hearing because defendant only became aware of evidence at that point).

-

**ACCESS TO THE COURTS**

Reyes argues that he was denied access to the court system because "jail personnel sabotaged [his] efforts to file pleadings and make requests." In support of his issue, he argues that the "right of access to the court system is afforded a prisoner by way of the Due Process Clause" and cites to *Bounds v. Smith*, 430 U.S. 817, 828 (1977), and *Lewis v. Casey*, 518 U.S. 343, 346-48 (1996). However, both *Bounds* and *Lewis* were *civil rights* lawsuits where the litigants argued that prison officials violated their constitutional right of access to the courts. In *Bounds*, 430 U.S. at 828, the Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." In *Lewis*, 518 U.S. at 346, the Court limited its holding in *Bounds*, explaining that prisoner authorities had no duty to enable prisoners to discover grievances and litigate effectively. Neither of these cases involve a denial of the right to access the court system in the context of a direct appeal from a criminal conviction.

Reyes further cites *In re Bonilla*, 424 S.W.3d 528, 530 (Tex. Crim. App. 2014), where an indigent prison inmate sought a writ of mandamus to compel the trial court clerk to disclose information concerning the costs associated with preparing transcripts to challenge his conviction in an application for writ of habeas corpus. Again, Reyes has not cited any authority in the context of a direct appeal from a criminal conviction.

We note that the Texas Court of Criminal Appeals in *Bright v. State*, 585 S.W.2d 739, 744 (Tex. Crim. App. [Panel Op.] 1979), the appellant, who "acted as his own counsel" relied on *Bounds* and argued that he was denied access to the court because the trial court did not furnish him an annotated Code of Criminal Procedure. The court of criminal appeals rejected his argument,

explaining that an attorney had been "appointed to represent appellant, and even after appellant's request to represent himself was granted, this attorney was instructed by the trial court to continue as standby counsel." *Id*. Thus, the court held that "appellant was provided adequate assistance from persons skilled in the law." *Id*. Further, the court explained that the appellant had not shown harm. *Id*.

As noted previously, Reyes was appointed standby counsel to aid him during trial and thus was provided adequate assistance from persons skilled in the law. *See id*.; *Johnson v. State*, 257 S.W.3d 778, 780-81 (Tex. App.—Texarkana 2008, pet. ref'd) (holding that because standby counsel was appointed after appellant elected to represent himself, the "State was not then obligated to also provided [appellant] with access to a law library" under *Bounds* and *Lewis*). Further, Reyes has failed to show how he was harmed. *See* TEX. R. APP. P. 38.1(i) (requiring brief to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); *see also Bright*, 585 S.W.2d at 744 (requiring appellant to show harm). In his brief, he complains that the "jail prevented [him] from delivering his handwritten pleadings to the trial court for filing" and that the "trial judge ignored [him] when he explained this problem while holding copies of pleadings that he had tried to file." Our review of the record reflects that while Reyes mentioned during pretrial hearings that he had generated and attempted to file a motion for discovery and a motion for bond reduction, the trial court did not ignore Reyes's complaints. At the pretrial hearing on January 10, 2022, when Reyes stated that he had filed a motion for bond reduction, the State complained it had not received such a motion. The trial court then directed the court coordinator give a copy of Reyes's motion to the State and, despite the State not having a copy of the motion in advance of the hearing, allowed Reyes to proceed with his

motion. At another pretrial hearing on June 28, 2022, Reyes complained he had filed a motion for discovery and asserted that the State had not provided him with all discovery or a "witness list":

> And also I have not gotten full discovery. The State has, uh, has given me no discovery, witness list or nothing. I have not gotten the officer's report, hospice report, I have not seen the officer's report.

The prosecutor replied, "I am not aware of anything in this case being involved with hospice so I am not sure what he's referring to with hospice. I know what hospice is but I don't know of anybody involved with this case that is involved with hospice." Reyes stated, "There was a hospice report . . . . It was an assault that you were trying to get in a misdemeanor case. I guess that case was dropped and the misdemeanor case because there was no hospice report, and I guess the indictment—" The trial court interrupted and asked Reyes to "go one step at a time." The trial court asked Reyes, "The first thing is I guess you have received some discovery?" Reyes replied, "We are talking about hospice. There was a misdemeanor case that involved coincided [sic] with the family case, Your Honor." The trial court stated that it was not concerned with a separate family case but with the case at issue. The State then said that it had provided Reyes with everything in its file. The prosecutor explained the District Attorney's Office "only handles felonies," a separate county attorney handled misdemeanor cases, and Reyes needed to contact the county attorney to obtain any information relating to misdemeanor cases in the county attorney's possession. The trial court again told Reyes that the State had given everything in its file to Reyes and asked Reyes specifically what he claimed was missing. The record thus reflects that the trial court did not *ignore* Reyes's complaints and made every effort to determine what his exact complaints were.

For the reasons stated above, we find no merit to Reyes's argument that he was denied access to the courts.

## CUMULATIVE ERROR

Finally, Reyes urges this court to consider the cumulative impact of the errors presented above. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (holding that a number of errors may be deemed harmful in their cumulative effect). As we have held that the above issues have no merit, there is no cumulative error requiring reversal. *See Gallegos v. State*, 340 S.W.3d 797, 805 (Tex. App.—San Antonio 2011, no pet.); *Jimenez v. State*, 307 S.W.3d 325, 335 (Tex. App.—San Antonio 2010, pet. ref'd).

In addition to the above issues, in this final issue, Reyes also argues "the trial court confessed in response to this Court's order that the original Charge of the Court as to Defendant's Punishment and the jury's signed verdicts on punishment have been lost or destroyed." "When a filing designated for inclusion in the clerk's record has been lost or destroyed, Texas Rule of Appellate Procedure 34.5(e) provides that the parties may, by written stipulation, deliver a copy of the filing to the trial court clerk for inclusion in the record." *Johnson v. State*, 176 S.W.3d 94, 96-97 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (discussing Rule 34.5(e)). "If the parties cannot agree, the trial court must determine what constitutes an accurate copy of the missing document and order it included in the record." *Id*. "We afford almost total deference to a trial court's ruling on questions of fact, particularly when the trial court's ruling turns on the credibility of the witnesses." *Id*.

In compliance with Texas Rule of Appellate Procedure 34.5(e), the trial court ordered an accurate copy of the Charge of the Court as to Defendant's Punishment and Verdict Forms to be filed in a supplemental clerk's record. *See* TEX. R. APP. P. 34.5(e). The only difference between original jury charge on punishment and this copy is that the original was signed and the copy is unsigned. We note that the reporter's record of the punishment stage of trial reflects that the trial

court read the same jury charge on punishment as the copy found to be accurate by the trial court. The reporter's record reflects that Reyes had no objections to the jury charge on punishment. The reporter's record further reflects that after the jury had finished deliberating, it sent the trial court a note that it had come to a verdict on punishment. After the jury entered the courtroom, the trial court asked whether it had reached a verdict. The foreperson confirmed that the jury had reached a verdict. The trial court then asked whether the verdict was unanimous, and the foreperson replied that it was. The trial court then read the jury's verdict:

> I am just going to read the punishment verdict. Under, uh, Count I, it says, uh, we, the jury, uh, having found the defendant, uh, Ricky Lee, uh, Reyes guilty of the offense of sexual assault on the accusation, prior conviction, has been proven true, we assess the defendant's punishment, and, uh, and have selected imprisonment in the Texas Department of Criminal Justice for a term of 70 years and a fine of $10,000. Signed by foreperson. And punishment verdict, uh, Count II, we, the jury, have found the defendant, uh, Ricky Lee Reyes guilty of the offense of sexual assault on the accusation of the prior conviction has been proved too. We assess the punishment—uh, we assess the defendant's punishment imprisonment in Texas Department of Criminal Justice for a term of 70 years and a fine of $10,000.

The trial court asked if there was any objection to it dismissing the jury. Reyes replied that he had no objection. Therefore, Reyes has not shown on appeal that the copy of the jury charge on punishment was not accurate as found by the trial court. *See Johnson*, 176 S.W.3d at 97 (explaining that because "[t]here was no contravening evidence to show that, with the exceptions noted, the charge was not an accurate copy of the charge submitted to the jury," "the trial court did not err in ordering the record supplemented with the charge found in the State's file"). Thus, we hold his final issue is without merit.

## CONCLUSION

First, because there was sufficient evidence showing sexual assault by force and threats, the issue of consent as it relates to the victim was removed, and Reyes was therefore not entitled to an instruction on mistake of fact. Second, because standby counsel was appointed and utilized

by Reyes during trial, the trial court was not required to give *Faretta* self-representation admonishments. Third, because Reyes was aware during the guilt/innocence phase of his discovery complaints pursuant to *Brady* and article 39.14 of the Texas Code of Criminal Procedure, he failed to preserve his issue for appellate review because he did not move for a continuance during trial. Fourth, we find no merit to Reyes's argument that he was denied access to the courts. Fifth, we hold Reyes has failed to show cumulative error requires reversal. Therefore, we affirm the judgment of the trial court.

Adrian A. Spears II, Justice

PUBLISH